## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 26 2015, 8:39 am

*Kevin S. Smith*

**CLERK**
of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT

Michael B. Troemel
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

R.F. *(Minor Child), Child in Need of Services*

And

A.P. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

August 26, 2015

Court of Appeals Case No.
79A04-1412-JC-601

Appeal from the Tippecanoe Superior Court
The Honorable Faith A. Graham, Judge
The Honarable Crystal A. Sanders, Magistrate
Cause No. 79D03-1407-JC-201

**Robb, Judge.**

# Case Summary and Issues

[1] A.P. ("Mother"), appeals the juvenile court's ruling that her six-year-old son, R.F., is a child in need of services ("CHINS"), pursuant to Indiana Code sections 31-34-1-1 and -2. Mother raises three issues on appeal that we restate as whether the evidence supports the findings and whether the findings support the judgment. Concluding that substantial evidence supports the juvenile court's findings and that those findings support the judgment, we affirm.

# Facts and Procedural History

[2] Mother knew C.B. ("Boyfriend") in high school and began dating him in March 2014. Beginning in May of that year, Mother left R.F. and her fourteen-month-old daughter, S.F., in Boyfriend's care for up to nine hours at a time while Mother went to work. Boyfriend cared for the children on three or four occasions prior to the events at issue here.

[3] On Friday, July 18, 2014, S.F. was not feeling well. The next morning, S.F. was still not feeling well and was not eating normally. Mother gave S.F. some Tylenol. Mother went to work around 9:30 a.m., leaving R.F. and S.F. in Boyfriend's care. S.F. then napped off and on through the day. When she awoke from her last nap, S.F. appeared to Boyfriend to be back to normal. Boyfriend held S.F. on his lap while the other children[1] played. S.F. leaned

---

[1] Boyfriend's three-year-old son was also present that day.

back to take a drink from her sippy cup and then went limp in Boyfriend's arms. Boyfriend called Mother, who was on her way home from work. After she arrived home and saw S.F., Mother called her mother, T.D. ("Grandmother"). Boyfriend wanted to call 9-1-1, but Mother wanted to wait for Grandmother's opinion.

[4] Grandmother arrived shortly thereafter. By that time, S.F. was conscious but appeared dazed. Mother decided to wait until the next day to go to the hospital to see if S.F.'s condition improved. Grandmother recommended that they give S.F. Tylenol and that they keep an eye on the child. Grandmother noticed that S.F. had a bite mark on her right hand and what appeared to be fingerprints on her upper left arm. Grandmother asked Boyfriend and Mother about the marks but received no explanation. S.F. spent most of the next day, Sunday, with Grandmother and appeared to be acting normally. Monday morning S.F. had a mild temperature. Mother administered more Tylenol before putting S.F. in her crib. Mother placed S.F. and R.F. in Boyfriend's care and left the home for an appointment.

[5] Later that day, S.F. became unresponsive. S.F. was treated at a local hospital and then was airlifted to Riley Hospital in Indianapolis. S.F. had twenty separate areas of bruising on her body, including on the left and right side of her forehead, on her right ear, behind her left ear, on the right side of her neck, on her right hand, wrist, forearm, and armpit, on her left arm near the armpit and elbow, on her chestwall, on her abdomen in multiple places, up and down her right and left legs, and on her right buttock. In addition, S.F. had sustained a

subdermal hematoma. She could no longer breathe on her own, and her pupils had ceased to react to light. S.F. died from her injuries on July 22, 2014. It was the opinion of the physician who treated S.F. that S.F.'s injuries were non-accidental and consistent with child abuse.

[6] Following S.F.'s death, R.F. was removed from Mother's home and placed with a relative. A CHINS petition was filed. At the fact-finding hearing on the petition, Mother and Boyfriend denied inflicting S.F.'s injuries. Neither Mother nor Boyfriend offered an explanation as to how S.F. sustained her injuries. The juvenile court found that R.F. was a CHINS. Additional facts will be added as necessary.

# Discussion and Decision

## I. Standard of Review

[7] When, as here, the juvenile court enters findings of fact and conclusions thereon in a CHINS determination, we apply a two-tiered standard of review. *In re J.V.*, 875 N.E.2d 395, 402 (Ind. Ct. App. 2007), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the conclusions. *Id.* In making this determination, we do not reweigh the evidence or reassess witness credibility. *Id.* We will reverse only if, considering the evidence favorable to the juvenile court's judgment, the evidence does not support the findings or the findings do not support the judgment. *Id.* We may not set aside the findings or judgment unless they are clearly erroneous. *In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App.

2014) (citing Ind. Trial Rule 52(A); *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000)). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id.* (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)).

# II. Evidence Supporting the Findings

[8] Regarding the Saturday incident when S.F. first lost consciousness, the juvenile court found that

> [b]oth Mother and Grandmother went to the home and, upon arrival, both report [S.F.] was breathing and did not appear to be in distress, though she was *unconscious*.

Appellant's Appendix at 40 (emphasis added). Mother argues that this finding was not supported by evidence.

[9] Boyfriend testified as follows:

> Q: So that was about 15 minutes later after you called the Mother for the – or since you had spoken to her and she was on her way home?
>
> A: Yes.
>
> Q: And then was [S.F] still unconscious?
>
> A: By the time *her mom* - by the time *her mom* showed up there she was like, she had come to. It was like a switch flipped, like you know she was responsive, she was looking around and everything, smiling, like back to normal.
>
> Q: How long did it take for [S.F.] to become responsive again?
>
> A: Probably like – as soon as – for about like two minutes or so before *her mom* pulled up to that apartment is when she like started coming to. She was like –
>
> Q: When you say *her* do you mean the Mother or the grandmother?

A: The grandmother, the grandmother.

Transcript at 79 (emphasis added).

[10] With respect to Mother, the evidence showed that she arrived at the home and then called Grandmother. Grandmother arrived five or ten minutes later. Thus, according to Boyfriend's testimony, there was a period of time between Mother's and Grandmother's arrival during which S.F. was still unconscious. This evidence supports the juvenile court's finding that S.F. was still unconscious when Mother arrived. In her Brief, Mother does not address the fact that Boyfriend clarified that he was referring to the grandmother's arrival in his testimony.

[11] We agree with Mother that the evidence did not support the juvenile court's finding as to Grandmother. No one testified that S.F. was still unconscious upon Grandmother's arrival. However, given the other findings supporting the judgment, the partial insufficiency of this finding does not undermine the CHINS determination.

# III. Findings Supporting the Judgment

[12] A CHINS determination requires that the juvenile court find that a child is endangered and that court intervention is necessary. Ind. Code §§ 31-34-1-1, -2. The juvenile court's Fact-Finding Order provided in relevant part as follows:

> The Court finds, by a preponderance of the evidence, that [R.F. is a CHINS], as defined by Indiana law:

. . . wherein the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parents, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision.

. . . wherein the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian.

In that: [*sic*] Court finds [R.F.] to be a CHINS based on Mother's failure to seek medical care for [S.F.], Mother's failure to supervise the children, and Mother's failure to protect the child from the supervising custodian.

The Court further finds that the child need [*sic*] care, treatment, or rehabilitation that the child is not receiving; and that is unlikely to be provided or accepted without the coercive intervention of the Court.

Appellant's App. at 42. Mother argues that the juvenile court's findings that she failed to supply medical care, failed to supervise, and failed to protect do not support the judgment.

# A. Failure to Seek Medical Care

[13] The findings pertaining to Mother's failure to seek medical care for S.F. are as follows:

8. Sometime Saturday afternoon, [Boyfriend] contacted Mother and Grandmother because [S.F.] passed out while in his care.

9. Both Mother and Grandmother went to the home and, upon arrival, both report [S.F.] was breathing and did not appear to be in distress, though she was unconscious. Neither Mother, Grandmother nor [Boyfriend] took [S.F.] to the hospital or a physician to be examined.

10. Grandmother reports she noticed a bite mark and bruising on [S.F.'s] arm but [S.F.] was unable to articulate the source of the bruising due to her age. Neither Mother nor Grandmother reported

the bite marks or bruising to CPS or law enforcement. Further, the only explanation offered by [Boyfriend] to Mother for the bruising was that [R.F] grabbed [S.F.'s] arm and would not let go.

***

23. Further, Mother did not seek medical treatment for [S.F.] after [S.F.] was unresponsive on the first occasion.

Appellant's App. at 40-42. Mother argues that, because S.F. eventually appeared to act normally after she passed out on Saturday, there was seemingly no reason to take S.F. for medical treatment. Mother also briefly argues that any failure on her part to seek medical care for S.F. would not repeat itself because R.F. is old enough to speak.

[14] We disagree. There was no evidence presented at the fact-finding hearing that S.F. had a history of losing consciousness. Although it is unclear from the record precisely how long S.F. was unconscious, it was for more than just a moment. The sustained loss of consciousness, especially in a child who has no prior history of it, is a significant health event, even if the child does subsequently appear normal. Given that S.F. had not been feeling well, passed out, and exhibited a bite mark and bruises on her arm, the juvenile court's conclusion that Mother should have been alerted that something was wrong with S.F. that merited medical attention was not clearly erroneous. To the extent that Mother argues that the intervention of the court was not necessary because R.F. can speak, we note that the potential capability of a child to explain why he lost consciousness would not alter the fact that the child had passed out and needed medical attention. We conclude that the juvenile court's

findings regarding Mother's failure to seek medical care support the judgment that R.F. was endangered and that court intervention was necessary.

## B. Failure to Supervise/Protect from Custodian

The juvenile court's order provided the following regarding Mother's failure to supervise the children and/or protect them from her chosen custodian, Boyfriend:

> 7. On Saturday, July 19, 2014, Mother had [Boyfriend] babysit the children.
>
> 8. Sometime Saturday afternoon, [Boyfriend] contacted Mother and Grandmother because [S.F.] passed out while in his care.
>
> ***
>
> 11. On Monday, July 21, 2014, Mother again left [S.F.] home with [Boyfriend] while she went for a manicure. Mother was gone approximately one to one and one-half (1 ½ ) hours….
>
> ***
>
> 22. It is unknown whether Mother or [Boyfriend] inflicted the injuries upon [S.F], however, a child is now deceased after being in the care of Mother and/or a custodian approved by Mother. In addition, Mother continued to leave the children in the care of [Boyfriend] without sufficient information to explain the injuries to [S.F.] in the form of a bite mark and bruising on her arm.
>
> ***
>
> 24. Mother either failed to supervise the children or failed to protect the children from exposure to injury, and the result is the tragic death of a child.
>
> 25. The Court is not required to wait until [R.F.] suffers a similar harm before intervening.

Appellant's App. 40-42. Mother argues that the juvenile court's findings do not support the conclusion that she failed to supervise the children or to protect

them from Boyfriend because "it amounts to a finding that [M]other should have foreseen the harm coming to S.F." Brief of Appellee at 10. Mother argues that nothing would have caused her to foresee that S.F. would become ill or injured, and she directs us to evidence supporting her decision to allow Boyfriend to care for her children.

[16] Mother's argument is unpersuasive in that it focuses only on her version of the events that preceded S.F.'s death. In making a CHINS determination, a juvenile court considers the circumstances surrounding the events that caused the petition to be filed as well as the circumstances at the time of the fact-finding hearing. *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013) (reversing a CHINS determination where juvenile court failed to consider improvement made by parents by the time of the fact-finding hearing). Mother has never disputed that she had custody of S.F. and that S.F. died after being in the care of Boyfriend. It was the opinion of the physician who treated S.F. at Riley Hospital that S.F. was the victim of abuse and that her injuries were non-accidental.

[17] At the fact-finding hearing, Mother denied inflicting S.F.'s injuries, and she had no explanation as to how those injuries had occurred. Since the cause of S.F.'s injuries was unknown, we cannot say that it was clearly erroneous for the juvenile court to conclude that Mother had failed to supervise or protect her children and that removal was necessary to protect R.F. This is particulary true in light of the fact that "'[a] CHINS adjudication does not establish culpability on the part of a particular parent.'" *In re Des.B.*, 2 N.E.3d at 835 (quoting *N.L.*

*v. Ind. Dep't of Child Servs. (In re N.E.)*, 919 N.E.2d 102, 105 (Ind. 2010)). "Said differently, the purpose of a CHINS adjudication is to protect children, not punish parents." *In re N.E.*, 919 N.E.2d at 106.

# Conclusion

[18] We conclude that the juvenile court's finding that S.F. was unconscious when Grandmother arrived is unsupported by the evidence, but that the insufficiency does not undermine the CHINS determination. The trial court's judgment that Mother failed to seek medical care for S.F. and failed to supervise or protect her children, endangering R.F. and requiring the coercive intervention of the court, was supported by the findings.

[19] Affirmed.

Vaidik, C.J., and Pyle, J., concur.