## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 28 2017, 10:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cathy M. Brownson
Coots Henke & Wheeler, PC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of B.B. (Minor Child)

 J.B. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 28, 2017

Court of Appeals Case No. 29A04-1610-JC-2453

Appeal from the Hamilton Circuit Court

The Honorable Paul A. Felix, Judge

The Honorable Todd L. Ruetz, Magistrate

Trial Court Cause No. 29C01-1602-JC-216

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, J.B. (Father), appeals the trial court's Order adjudicating his minor child, B.B. (Child), as a Child in Need of Services (CHINS).

We affirm.

# ISSUE

Father raises one issue on appeal, which we restate as follows: Whether the trial court erred in adjudicating the Child as a CHINS.

# FACTS AND PROCEDURAL HISTORY

Father and A.B. (Mother) are married and reside in Fishers, Hamilton County, Indiana.[1] Together, they are the biological parents of a son, Be.B., born on August 21, 2014; and a daughter, the Child, born on February 6, 2016. Father and Mother also each have a child from prior relationships: Father's son, E.S., born on August 10, 2002; and Mother's son, J.C., born on February 13, 2001. Mother has custody of J.C., whereas Father had no significant involvement in E.S.'s life until E.S. was approximately fourteen years old.

Mother has a long history of mental illness, which has resulted in numerous hospitalizations and involuntary commitments. Her diagnoses include

---

[1] Mother is not a party to this appeal. Facts pertaining to Mother are included as necessary.

schizoaffective disorder, psychosis, depression, post-traumatic stress disorder due to being raped, and factitious disorder. Mother's "episodes take[] many forms, and [they] come[] and go." (Appellant's App. Vol. II, p. 48). At some point during these proceedings, Mother was involuntarily and indefinitely committed through Aspire Indiana, Inc. (Aspire), pursuant to which Mother is required to regularly attend therapy and to receive her medications via involuntary injection if she refuses to take them as prescribed.

[6] Mother's chronic mental health issues have also raised safety concerns regarding her ability to parent. In October of 2013, the Hamilton County office of the Indiana Department of Child Services (DCS) removed Mother's oldest child, J.C., from the home. Following J.C.'s adjudication as a CHINS, reunification efforts were undertaken, and J.C. was successfully returned home with the case closing in July of 2014. However, following the birth of Be.B. in August of 2014, Father and Mother became stressed with parenting in light of Mother's mental health issues. As a result, for the first few months of Be.B.'s life, J.C. often acted as the primary caregiver. In approximately October of 2014, Father sought help from the family's church congregation, and Ja.C. and T.C. (Foster Parents) provided assistance. By January of 2015, the Foster Parents had full-time custody of Be.B. under an informal "temporary care" agreement executed by Father, Mother, and the Foster Parents. (Appellant's App. Vol. II, p. 43).

[7] On July 23, 2015, Mother was hospitalized for her mental health issues, at which point DCS again became involved with the family. DCS reported

concerns of Father's inability to care for the children on his own. The next day, DCS officially removed J.C. and Be.B. from Father and Mother's custody, and they were subsequently adjudicated as CHINS. While DCS placed Be.B. in the care and custody of Foster Parents, it is unclear where J.C. was placed. Thereafter, DCS provided services to the parents designed to reunify them with the children. In October of 2015, Mother was again hospitalized as "her episodes became more frequent." (Appellant's App. Vol. II, p. 48).

[8] In November of 2015, as part of the CHINS proceedings concerning J.C. and Be.B., both Father and Mother were ordered to undergo a parenting assessment. This parenting assessment gave rise to concerns about Father's insight into Mother's mental health issues and about his relationship with Mother and the Children. Because of these concerns, along with the fact that Father refused to participate in certain aspects of the assessment, a psychiatric evaluation was ordered. Although Father did not complete a psychiatric evaluation, he did eventually undergo a psychological evaluation.

[9] On February 6, 2016, Mother gave birth to the Child—approximately four weeks before her due date. For reasons unknown, the Child was born in respiratory distress and had to be intubated and placed on a ventilator in the neonatal intensive care unit (NICU) at Community North Hospital in Indianapolis. By the next day, the Child had improved drastically and was removed from the ventilator.

[10] Because of its open CHINS case with the Child's siblings, along with reported concerns of parental neglect concerning the Child, on February 7, 2016, a DCS family case manager went to Community North Hospital to check on the Child. DCS observed the Child in the NICU and noted that she "looked healthy." (Appellant's App. Vol. II, p. 21). A nurse reported to DCS that, despite being medically able to do so, Mother had not left her bed since giving birth and, therefore, had not been to the NICU to see the Child; nor had Mother asked about the Child's well-being. The nurse stated that Father had seen the Child only once because, even though Mother was stable and the Child had been in critical condition, Father "treated [Mother] like a child" and refused to leave her side. (Tr. p. 14). Thereafter, DCS visited with Father and Mother. According to DCS, Mother was lying in bed, which was covered in blood. Father, who had been asleep when the family case manager walked into the room, did not speak. However, both parents submitted to a drug screen at DCS's request; the results were negative.

[11] Mother was discharged from the hospital on February 8, 2016. During the three days that Mother was in the hospital, she saw the Child only once for a few minutes. During that brief visit to the NICU, Mother "continuously reach[ed]" for Father, which indicated to the nurse a co-dependent relationship. (Appellant's App. Vol. II, p. 21). Father went to the NICU a total of three times to see the Child prior to Mother's discharge. When DCS subsequently followed up with hospital staff, the nurses reported that Mother refused to shower, care for herself, or leave her bed in order to use the restroom. Instead

of performing her own pericare (such as using "the pads[] and undergarments" to contain the postpartum bleeding) or allowing the nurses to assist her with such, Mother "would wipe her hands between her legs, in her blood, and then wipe it on the nurses." (Appellant's App. Vol. II, p. 21; Tr. p. 5). DCS also learned that, after rubbing her hands between her legs, Mother would spit into her bloody hands, rub them together, and attempt to convince the nurses that she was spitting up blood or that her throat was bleeding. Additionally, Mother dramatically complained of persistent pain and an inability to walk. The nurses examined each of Mother's perceived ailments and discovered no medical issues. Furthermore, although Mother's doctor reassured her that there was no reason for concern, Mother expressed a fear that her blood pressure would "skyrocket" if she were to stand up. (Appellant's App. Vol. II, p. 22). At Mother's insistence, a catheter was inserted. Despite the nurses' admonishments, Father and Mother repeatedly turned on the valve to allow oxygen to flow into the room, purportedly because Mother was dizzy and lightheaded. Multiple nurses opined to DCS that Mother would not be capable of providing care for a newborn.

[12] DCS additionally spoke with the parents' home-based caseworker in their ongoing CHINS case, who stated that she did not believe Mother would be able to care for a newborn. Although Mother's therapist from Aspire noted that Mother had demonstrated improvement in the preceding weeks, DCS consulted the monthly report from Aspire, which stated that Mother maintains child-like tendencies and lacks the motivation to complete activities of daily living. The

report further expressed that Father appears to lack knowledge regarding the severity of Mother's mental illness.

[13] On February 11, 2016, DCS interviewed Father and Mother at their home. Father informed DCS that although he had not accepted any fares in the previous month as a driver for Uber, he had recently secured employment delivering pizzas and expected to work on Thursday, Friday, and Saturday evenings. In discussing their plan for the Child upon her discharge from the NICU, Father indicated that Mother would care for the Child while he was at work. In addition to applying to have child care one day per week, Father indicated that his aunt would be willing to babysit if he and Mother ever wanted to go out for a date night. The next day, DCS returned to Father and Mother's home to notify them that, due to the reports received from the hospital staff, it would be taking the Child into custody. Both Father and Mother claimed that the nurses were lying about Mother's conduct.

[14] On February 16, 2016, the Indiana Department of Child Services (DCS) filed a petition alleging the ten-day-old Child to be a CHINS. The CHINS petition alleged that the Child "needs care, treatment, or rehabilitation that the Child is not receiving and is unlikely to be provided or accepted without the coercive intervention of the [c]ourt." (Appellant's App. Vol. II, p. 16). In support of this, DCS cited Mother's history of mental health problems, including hospitalizations and commitments; Mother's bizarre behavior in the hospital and refusal to care for herself; Father's failure to demonstrate an understanding of the severity of Mother's mental health issues and his plans to leave the Child

in Mother's care; the hospital staff's concerns about Mother's ability to take care of a newborn; and the parents' prior CHINS cases.

[15] On February 17, 2016, the trial court conducted a detention hearing and appointed separate counsel to represent Father and Mother. The trial court also appointed guardians *ad litem* (GAL) for both Mother and the Child. In a subsequent order, the trial court found that there was probable cause to believe the Child to be a CHINS and determined that DCS's detention of the Child was necessary for the Child's protection. The following day, the Child was discharged from the NICU and was placed in the home of Foster Parents. On February 25, 2016, the trial court held an initial hearing, during which both parents denied the allegations raised in the CHINS petition.

[16] Over the next several months, Father and Mother participated in a variety of services provided by DCS. Mother was compliant with her mental health treatment through Aspire, even reaching the point where she was voluntarily taking her medication and no longer required injections. The parents participated in both individual and family therapy sessions, home-based case management, and regular visitation with the children. Although visitations were fully supervised at first, Father and Mother eventually gained unsupervised, overnight visits with J.C., Be.B., and the Child—with service providers only "pop[ping] in" to check on everyone. (Tr. p. 78). In fact, the visitation supervisors specifically noted that they never had to intervene regarding Father or Mother's parenting skills. By the summer of 2016, the service providers were reporting to DCS that they had no safety concerns with

respect to returning all three children back home. On July 28, 2016, J.C. was placed in the home for a trial home visit. Then, on August 4, 2016, Father's fourteen-year-old son, E.S., moved in with Father and Mother on a trial basis following the death of E.S.'s mother.

[17] A few days before the scheduled fact-finding hearing on the Child's pending CHINS adjudication, on August 26, 2016, DCS filed a Motion to Terminate Jurisdiction and Discharge the Parties. According to DCS, "[t]he conditions leading to the filing of this cause of action have been resolved without need for further involvement of [the] [c]ourt's intervention." (Appellant's App. Vol. II, p. 36). At the fact-finding hearing on August 29, 2016, DCS reiterated that the case should be dismissed because Father and Mother can provide for all the Child's needs without the court's coercive intervention. DCS presented evidence that Father and Mother "do a great job of managing the four kids." (Tr. p. 129). In addition to Mother's compliance with her mental health plan, the therapeutic visitation supervisor (who is also a therapist) testified that she had worked with Father regarding "psychoeducation about mental health diagnoses and symptoms" and described that they "developed a safety plan that involved [Father] and involved [Mother] in terms of [Mother's] own health and needs and potential signs or concerns and how to address them before they became a safety concern." (Tr. p. 146). Notwithstanding her belief that the children should be returned home and would be safe in their parents' care, the visitation supervisor testified that the family would be "in need of ongoing occasional therapy." (Tr. p. 142). Mother's therapist testified that Mother

would continue to receive therapy and other services through Aspire even after the end of DCS's involvement, and any failure to comply with her treatment would result in involuntary hospitalization. At the time of the fact-finding hearing, Father had only recently completed a psychological evaluation, so the results were not yet available.

[18] Contrary to the evidence presented by DCS, the GAL submitted his report into evidence, which expressed concerns with DCS's efforts to fast-track the return of the children to Father and Mother's care. Although the GAL was amenable to introducing the children back into the home on a trial basis, it opposed DCS's motion to dismiss the CHINS petition for the Child; the GAL stated that he

> can understand their position if they are just taking the last few months [into] account, however this family has a history with DCS dating back to 2013 and the GAL is taking [into] consideration the entire picture. The GAL's hope and goal is that this is the last time DCS will ever need to be involved with this family. These children deserve permanency and stability and with [Be.B.] and [the Child] being so young, the GAL believes it's in their best interests for the transition to be [a] slow and steady transition versus one that is fast and ends up being too much for everyone and the children have to be removed yet again. Since the end of July [2016,] the family has gone from zero children living in the home, to now two teenage boys, and potentially a toddler and infant in the very near future.

> The GAL is gravely concerned that going from zero to four children in a month, with a family that has had trouble caring for one toddler, is too much too fast and would recommend the transition be slower. The GAL would suggest it go from two

children to three, then three children to four over the course of [sixty to ninety] days. The GAL believes [Be.B.] should be the last child transitioned back [into] the home since he has such a strong bond and spent most of his life with the [Foster Parents], it would be more detrimental for him if the [trial home visit] was not successful. Finally, [the Child] is younger and the bond with [Mother] and [Father] is still being established so the time with [the Child] is more beneficial now . . . .

(Appellant's App. Vol. II, pp. 51-52). The GAL noted concerns of Mother's recurring mental health episodes, albeit conceding that Mother had demonstrated improvement in her parenting skills and did not exhibit any physical danger. The GAL also emphasized Father's inconsistency in being a parent—specifically mentioning his tendency to abandon his children when they need him. With particular respect to the Child, the GAL posited:

The GAL is in favor of reunification and wants everyone involved to be in the best position possible for it to be successful and most importantly, for it to be permanent. With the extra time that has passed because of the [c]ourt's intervention, the GAL is now comfortable agreeing to a [trial home visit] for [the Child]. (Prior, the GAL was reluctant, but agreeable to the [trial home visit] for [the Child], but when the ultimatum was given [by DCS] that it was for both children, then the GAL did not agree.)

However, the GAL would request that the [trial home visit] be contingent upon [the Child] being weighed at her doctor's office before the [trial home visit] begins and that [the Child] be weighed again by the same facility, using the same scale immediately prior to any review by the [c]ourt of the [trial home visit]. The GAL is concerned about the nutrition [the Child] will receive once returned to the care of [Mother] and [Father]

because they have indicated they want to begin [the Child] on an "organic" formula. The internet concoction formula they were giving [Be.B.] when [Be.B.] arrived in the care of the [Foster Parents] resulted in him being undernourished. Given [the Child's] medical concerns at birth, the GAL wants to make sure she receives the proper medical treatment and nutrition.

With the questionable honesty displayed by [Father] and [Mother] regarding [J.C.'s] high school,[2] the GAL is concerned that they could manipulate the status of a [t]rial [h]ome [v]isit to the detriment of [the Child's] health. [The Child] is defenseless and the GAL believes some monitoring will be necessary to ensure her safety.

(Appellant's App. Vol. II, p. 54).

[19]     Prior to concluding the hearing, the trial court denied DCS's motion to dismiss the CHINS action for the Child. The trial court indicated that it found the evidence established that "the continued intervention and oversight of the [c]ourt is necessary." (Tr. p. 153). The trial court remarked that it was

alarmed at the fact [that DCS] still does not have some safety concerns. Even [while] waiting for the parties to enter the courtroom today, [Father] is still arm-in-arm with [Mother] guiding and assisting her into the courtroom today. I don't know how possibly she can take care of four children, let alone one or

---

[2] As noted in his report, the GAL believed that Father and Mother were manipulating J.C. to "do whatever is 'easiest' for everyone [else] even if it's not what [J.C.] wants." (Appellant's App. Vol. II, p. 40). For instance, the GAL noted that despite J.C.'s desire to remain at Hamilton Southeastern High School and the parents' repeated assurances to the GAL that they would maintain this enrollment, Father and Mother withdrew J.C. from his high school within four days of commencing the trial home visit in order to send him to a closer school where J.C. had previously encountered problems.

two under the circumstances that have been presented and with what the [GAL] is reporting.

(Tr. p. 98). On September 8, 2016, the trial court issued an Order adjudicating the Child as a CHINS. In support of its adjudication, the trial court found as follows:

a. Continued intervention is necessary to protect the Child;

b. The Child has not been in the home with Mother and Father on a daily basis since her removal on February 12, 2016;

c. Mother has a history of mental health needs;

d. The DCS had a prior case in 2013 involving the Child's sibling;

e. Mother and Father are currently ordered to participate in services under a dispositional decree relating to the Child's siblings;

f. The family has been provided with multiple services and Father has failed to complete a psychological evaluation previously ordered;

g. Mother needs to continue psychological treatment and is currently ordered to do so under an involuntary commitment and working with Aspire;

h. Mother was compliant with medications and treatment at the time of the Child's birth and was still unable to care for the Child;

> i. Mother is subject to removal from the home of the Child under the involuntary commitment if she fails to comply with the court orders in that matter;
>
> j. In August 2016, the DCS received a new report regarding abuse of the Child while in Mother and Father's care and Mother admitted that the Child hit her head while being bathed in the kitchen sink.[3]

(Appellant's App. Vol. II, pp. 59-60).

[20] On September 12, 2016, the trial court ordered the Child to begin a trial home visit with Father and Mother. On September 28, 2016, the trial court held a dispositional hearing, and on October 4, 2016, the trial court issued its Dispositional Order. The trial court ordered the Child to remain under DCS's supervision and directed Father and Mother to comply with any services recommended by DCS under a parental participation plan.[4]

---

[3] We note that the evidence surrounding this finding is limited. It seems that Mother was bathing the Child in a tub within the kitchen sink, and somehow the Child slipped or fell. A full skeletal scan revealed no injuries. Although the evidence is sparse, it appears that, at this time, the relationship between the parents and the Foster Parents had significantly deteriorated, and there were multiple reports of abuse/neglect filed with DCS against both Father/Mother and the Foster Parents.

[4] After this appeal was filed, on December 5, 2016, the trial court held a periodic case review hearing and found that Father and Mother had fully complied with their case plans and demonstrated their ability to fulfill their parental obligations. Based on a successful reunification, the trial court closed the case and terminated its jurisdiction. However, such a resolution of the case does not preclude appellate review as "it is well established that the reunification of children with their parent and the trial court's closure of the CHINS proceeding does not render an appeal from the CHINS determination moot." *In re Des.B.*, 2 N.E.3d 828, 834 n.3 (Ind. Ct. App. 2014). While an appeal is generally dismissed for mootness, we may decide a case "where leaving the judgment undisturbed might lead to negative collateral consequences." *Roark v. Roark*, 551 N.E.2d 865, 867 (Ind. Ct. App. 1990). Our court has previously determined that a CHINS adjudication may have "potentially devastating consequences." *Id.* Not only is the record of a CHINS proceeding available to criminal courts for sentencing purposes, to prosecutors and other officials for impeachment purposes, and to courts for any future actions relating to custody or support, but "CHINS determinations often accumulate

Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

Father appeals the Child's CHINS adjudication. Parents have a fundamental right to direct the care, custody and control of their children, which is safeguarded by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App. 2013). However, parental "rights are limited, and the State has the authority under its *parens patriae* power to intervene when necessary to protect the health and safety of children." *Id.*

A CHINS finding does not establish culpability of a parent; rather, it is simply a determination that a child requires services "that are unlikely to be provided without the coercive intervention of the court." *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). The purpose of a CHINS adjudication is to protect the child, not punish the parents. *Id.* Nevertheless, "a juvenile court need not wait until a tragedy occurs to intervene." *In re R.S.*, 987 N.E.2d at 158. Furthermore, in a CHINS case, trial courts "are often faced with the challenge of balancing multiple factors and multiple voices." *In re K.D.*, 962 N.E.2d 1249, 1255 (Ind. 2012). Trial courts "must uphold the due process rights of parents, apply the proper law, and take into account recommendations and input" from the GAL,

and in extreme cases result in the termination of [the] parent[-]child relationship." *Id.* at 868. Thus, we will review the merits of the CHINS adjudication.

DCS, parents, other family members, the child at issue, "and often several attorneys." *Id.* "By their very nature, these cases do not fit neatly defined guidelines." *Id.*

[24] A CHINS proceeding is classified as a civil action; accordingly, the State bears the burden of proving that a child is a CHINS, as defined by the juvenile code, by a preponderance of the evidence. *Id.* at 1253. Our court will not reweigh evidence or assess the credibility of witnesses. *Id.* We will consider only the evidence and any reasonable inferences drawn therefrom that support the trial court's decision. *Id.* In this case, DCS alleged that the Child was a CHINS as set forth in Indiana Code section 31-34-1-1:

> A child is a [CHINS] if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[25]     Additionally, the trial court issued abbreviated findings of fact in support of its CHINS conclusion and appears to have done so *sua sponte*. Thus, as to the issues covered by the trial court's findings, we apply a two-tiered standard of review and will not reverse the findings or judgment of the trial court unless clearly erroneous. Ind. Trial Rule 52(A). First, we consider whether the evidence supports the factual findings; second, we determine whether the findings support the judgment. *In re R.S.*, 987 N.E.2d at 158. We will defer substantially to the trial court's findings of fact but not to its conclusions of law. *Id.* As to the issues not covered by the trial court's findings, we apply a general judgment standard and will affirm if it can be sustained on any legal theory supported by the evidence. *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[26]     It is well settled that "a CHINS adjudication may not be based solely on conditions that no longer exist." *In re R.S.*, 987 N.E.2d at 159. Rather, a trial court should also take into account "the parents' situation at the time the case is heard by the court." *Id.* In the present case, without specifically challenging the trial court's findings, Father claims that the evidence is insufficient to support the CHINS adjudication based on an improvement in conditions. He points out that DCS favored dismissing the action because it believed that the Child's needs would be satisfied without the coercive intervention of the court. Similarly, the service providers involved in the case opined that there were no safety issues which would prevent the Child and her siblings from being returned to their parents' care. Father and Mother had been successfully managing unsupervised, overnight visits multiple nights per week for several

months leading up to the fact-finding hearing. During those times, the visitation supervisors would "pop in" and observed that Father and Mother were able to manage all four children. (Tr. p. 78). Furthermore, Mother, at times, cared for the children on her own without incident while Father was at work. The evidence establishes that Mother was making progress in therapy and in recognizing and addressing her mental health needs. Even in the absence of DCS's involvement, Mother would still be required to attend therapy and maintain her medication through her Aspire commitment. Father cites to the testimony of the DCS case worker, who indicated that "Father had been compliant and demonstrated an understanding of Mother's mental health issues over time." (Appellant's Br. p. 12).[5]

[27] We recognize that in cases where parents make positive changes in their lives, "we should applaud them rather than condemn them through coercive action." *In re R.S.*, 987 N.E.2d at 159. Here, we do commend Father and Mother for taking the steps to improve their parenting skills and jointly address the concerns relating to Mother's mental health. That said, we cannot say that the

---

[5] We do note that immediately prior to the fact-finding hearing, the trial court conducted a permanency hearing with respect to J.C. and Be.B. During that permanency hearing, issues pertaining to the Child (who was not yet adjudicated a CHINS) were also discussed. At the start of the fact-finding portion of the hearing, the trial court declined DCS's request to incorporate the testimony given during the permanency portion simply because the trial court "wasn't listening to it from the standpoint of a fact-finding hearing." (Tr. p. 102). This testimony from the DCS caseworker was offered during the permanency portion of the hearing and was, therefore, not considered by the trial court for purposes of CHINS fact-finding. While DCS failed to elicit this same testimony from the caseworker during the fact-finding portion, we nevertheless note that the family's visitation supervisor testified that she had reviewed Mother's mental health issues with Father and developed a safety plan with Father to recognize Mother's needs and prevent safety issues.

trial court erred in determining that, at the time of the fact-finding hearing, the coercive intervention of the court was still required to ensure the Child's safety.

[28] There is evidence from the GAL's report to support a conclusion by the trial court that coercive court intervention was required. Notwithstanding the fact that the GAL seemingly agreed with the service providers that the safety issues had been eliminated to the extent that a trial home visit could be instituted, the GAL raised genuine concerns indicating that court oversight was necessary to ensure the protection of the Child during her transition back into Father and Mother's custody. In particular, when Be.B. was removed from the home in 2015, he was undernourished, which was believed to be the result of the fact that Father and Mother had been feeding him homemade formula based on a recipe they found online. The GAL had information that Father and Mother were planning to feed the same formula to the Child upon her return home. Furthermore, the GAL was directly confronted with what appeared to be manipulative conduct on the part of Father and Mother as a pretense for securing J.C.'s return home for a trial visit. Despite promising the GAL that they would maintain J.C.'s enrollment in a particular school, Father and Mother reenrolled him elsewhere almost as soon as he was returned home. The GAL indicated its belief that, based on their history, Father and Mother would similarly promise to voluntarily remedy lingering safety issues concerning the Child (*i.e.*, weight checks, ongoing therapy for the family, following through with recommendations from Father's psychological evaluation, etc.) but then decline to follow through upon the Child's return home. In addition, there is

evidence that, despite a successful reunification when J.C. was removed from the home due to Mother's mental health issues in 2013, Father and Mother were unable to maintain a safe environment for the remaining children to prevent DCS from becoming involved again. While there is certainly evidence to establish that Father and Mother had made substantial improvement in remedying the issues raised in the CHINS petition, there is also evidence in support of the trial court's decision that the coercive intervention of the court was required to ensure the Child's safe transition home, and we are not at liberty to reweigh that evidence.

# CONCLUSION

[29] Based on the foregoing, we conclude that the trial court did not err in adjudicating the Child to be a CHINS.

[30] Affirmed.

[31] Crone, J. and Altice, J. concur