# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**DANIELLE L. GREGORY**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
**ROBERT J. HENKE**
**DAVID E. COREY**
Office of the Attorney General
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF Des.B. AND Dem.B., MINOR CHILDREN IN NEED OF SERVICES, | ) ) ) | |
| E.B., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A02-1306-JC-487 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Diana J. Burleson, Magistrate
Cause Nos. 49D09-1302-JC-4253 and 49D09-1302-JC-4254

**February 4, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

E.B. ("Mother") appeals the trial court's order in which the court determined that Mother's two minor children, Des.B. and Dem.B. ("the children"), are children in need of services ("CHINS").[1] Mother raises three issues for our review, which we consolidate and restate as the following two issues:

1. Whether the trial court abused its discretion when it admitted certain evidence into the record.

2. Whether the trial court's order adjudicating the children to be CHINS is clearly erroneous.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

In November of 2012, the Indiana Department of Child Services ("DCS") received a report that Mother was using drugs in and selling drugs from her Marion County home in which the children, both of whom were under the age of three at the time, resided. The DCS assigned Family Case Manager Mary Thomas ("FCM Thomas") to investigate the report. At their initial meeting, Mother told FCM Thomas that she did not use drugs and that she had violent relationships with the children's fathers. At a follow up meeting with FCM Thomas on December 6, Mother stated that "she had used cocaine" three days before the initial meeting and that "she intended to move to Florida with her children" in order to "get away from the situation between herself and her children's fathers." Transcript at 24.

---

[1] The trial court also adjudicated Des.B. and Dem.B. to be CHINS with respect to their fathers, but the fathers do not participate in this appeal.

In January of 2013, FCM Thomas attempted to follow up with Mother at her residence, but when she arrived at Mother's home "no one [was] living there." Id. at 25. FCM Thomas was later able to contact Mother, but Mother twice "declined to tell [FCM Thomas] where the children were." Id. Mother eventually brought the children to the Child Advocacy Center. On February 4, the DCS filed its petition alleging the children to be CHINS based on Mother's admitted cocaine use and her refusal to disclose the location of the children. On February 5 Mother took a drug test and tested positive for alcohol and marijuana.

On February 26, Mother agreed to undergo a substance use disorder assessment with social worker and clinical addiction counselor Tatenda A. Mandaza.[2] According to Mandaza's written assessment (the "Assessment"):

> Psychosocial summary:   . . . Client stated she currently works at Babe's as an exotic dancer and has been working there for four years.  Prior to this, client also worked at a different club as an exotic dancer for two years. . . .
>
> * * *
>
> SUBSTANCE USE HISTORY
>
> * * *
>
> Substance:  Cocaine
>
> Route:  Snorted/Inhaled
>
> Frequency:  One to two times per week
>
> * * *
>
> Date of last use:  3 months ago

---

[2] The spelling of Mandaza's name in the transcript and Mother's brief is not consistent with her own spelling of her name.  See Transcript at 28.

* * *

Substance:  Marijuana

Route:  Smoked

Frequency:  Daily

Age of first use:  15

Date of last use:  12 months ago

* * *

SUBSTANCE USE:  MEDICAL/FUNCTIONAL PROBLEMS

* * *

Comments:  . . . Client stated the substance she prefers the most is cannabis.  Client considers her use of alcohol as recreational and stated she only experimented with cocaine.  However, in prior DCS reports, client indicated she used "a small amount" of cocaine regularly at work.  Client has experienced legal problems more than once in the past due to cannabis and alcohol use.  Client stated she has used illicit substances at parties, with friends and also by herself.  Client stated she has used illicit substances while at work as an exotic dancer because she works at night a[nd] feels she needs more energy at work.  Client further stated the longest she has gone without any alcohol or illicit substance use is 12 months since she first began.  Client stated her motivation for trying to quit using marijuana is involvement . . . with the Department of Child Services.

Relapse potential:  Client works in an environment where alcohol is served and she has easy access.  Client has also failed a drug screen due to cannabis while she has been involved with the DCS.  However, client has shared a desire to parent her children and fulfill DCS requirements so she can be reunified with her children.

Ex. Vol. at 10, 13-14.  In light of those circumstances, Mandaza made the following recommendation:

Clinical impression/recommendations:  . . . Upon DCS involvement in November, 2012, client tested positive for cocaine.  Client also tested positive for Alcohol and marijuana in February, 2013.  Client currently has

4

an open criminal case for possession of marijuana. RECOMMENDATIONS: Client should begin intensive outpatient treatment in a group and individual setting. Client should attend at minimum three classes three times per week for a total of nine hours per week. []Client will benefit from regular drug-screening for additional accountability. Client should complete a parenting assessment and be provided with psychoeducation on parenting, child development and child safety. Client should also utilize safety planning to maintain the physical and emotion[al] safety of all her children within the home.

Id. at 10-11. Mandaza further concluded that Mother's substance abuse was "pathological" and diagnosed Mother with major depressive disorder, cannabis dependence, and cocaine abuse. Transcript at 31; Ex. Vol. at 15.

On March 18 and April 8, the court held a fact-finding hearing on the DCS's petition. At that hearing, Mandaza testified, and the Assessment was admitted into evidence over Mother's objection that the Assessment was hearsay and cumulative of Mandaza's testimony. Also at the hearing, John Martin of the Redwood Toxicology Laboratories in California testified, over Mother's objection, via telephone. Martin testified that he had analyzed Mother's February 5 drug test and determined that she had used alcohol and marijuana.

The DCS also called family case manager Kendra Washington ("FCM Washington") to testify. FCM Washington described Mother's relationships with the children's fathers as a "pattern of inappropriate . . . [and] unsafe relationships in[] the children's li[ves]" that "expos[ed] those children to violence." Transcript at 61. She further testified that Mother's plan to deal with those violent relationships was "to run away from the problem" and that "we need to address the problem." Id. And FCM Washington testified that, near the end of February 2013, Mother told her for the first

5

time that Mother had been arrested in November 2012 for, among other things, possession of marijuana. FCM Washington stated that Mother's belated admission was "concerning" because,

> especially when it comes to drug related criminal history, we know that that's one of those charges that could lead to incarceration. And so if we were to place the children back in her care and she's to later be incarcerated, that's just another transition, another moment of trauma, for the children. And so special circumstances like that need to always be brought up.

Transcript at 56-57.

On April 30, the trial court entered its order adjudicating the children to be CHINS. In relevant part, the court found as follows:

> 8. When this case opened [Mother] had moved into a new house so that [Des.B.'s father] would not know where she lived. [Mother] had plans to move to Florida to get away from the children's fathers because both . . . have been harassing her through unwanted phone calls and going to where she lives.
>
> 9. In 2009 both [fathers] had protective orders protecting each from the other because of fighting. [Mother] was convicted of Domestic Battery and Criminal Mischief. She said that the courts put the no contact order in place because "I guess we [were] fighting[,"] yet, incredibly, she does not remember specifics about the incident.
>
> 10. Approximately three (3) years ago [Des.B.'s father] tried to stab [Mother] and [Des.B.,] who was two (2) months old, and knocked [Mother's] teeth out. [Mother] called the police, cooperated in his prosecution[,] which led to a conviction, and she obtained a protective order which is still in effect. [Des.B.'s father] has been released from prison and is in work release.
>
> 11. During the investigation of this case, [Mother] admitted to [FCM Thomas] that she used cocaine in late November.
>
> 12. [Mother] was arrested in November 2012 and on March 5, 2013[,] pled guilty to possession of marijuana.

6

13. [Mother] had previously been convicted of misdemeanor Operating a Vehicle While Intoxicated on October 10, 2010[,] and was placed on probation for 355 days.

* * *

15. A drug screen collected on February 5, 2013[,] showed positive results for alcohol and marijuana.

16. [Mother] works at Babe's as an exotic dancer where alcohol is readily available. She has worked there four (4) years and at another club for two (2) years before that.

17. [Mother] uses illegal substances while at work because she needs more energy. She has also used illicit substances at parties.

18. During her substance abuse assessment on February 26, 2013[, Mother] admitted to using marijuana daily and cocaine one to two times per week. She reported that her last use of marijuana was a year ago, yet she had a positive drug screen for marijuana on February 5, 2013[,] which is less than a month before the assessment.

19. The professional who conducted the substance abuse assessment recommended intensive outpatient treatment; a parenting assessment because [Mother's] substance abuse could affect her parenting; and random drug screens for accountability. The recommendations are usage [sic] while being the primary caregiver responsible for her children's daily care and safety.

20. [Mother] wants to be reunified with her children and her motivation for trying to quit using marijuana is her involvement with the DCS.

21. [Mother] is the mother of two very young children who need constant care. She has admitted to daily use of drugs, admitted to using drugs at work and socially[,] and recently pled guilty to possession of marijuana.

22. The Court finds that there is a substantial risk of endangering the children due to [Mother's] history of untreated drug and alcohol use; the conclusion of a substance abuse assessment that her substance abuse could affect her parenting; the fact that her alcohol and drug use has led to legal problems; her daily use of drugs while being the primary caretaker of her children; and a pattern of unsafe relationships with the children's fathers[,] which put [Mother] and her children at risk. The family is in need of

7

services which it is not receiving but for the coercive intervention of the [C]ourt.

Appellant's App. at 101-02. This appeal ensued.[3]

## DISCUSSION AND DECISION

### Issue One: Admission of Evidence

We first consider Mother's arguments on appeal that the trial court abused its

discretion in the admission of certain evidence. Our standard of review of a trial court's

admission or exclusion of evidence is an abuse of discretion. Speybroeck v. State, 875

N.E.2d 813, 818 (Ind. Ct. App. 2007). A trial court abuses its discretion only if its

decision is clearly against the logic and effect of the facts and circumstances before the

---

[3] In its ensuing dispositional order, the trial court found that Mother had completed all ordered services, that she "has had clean screens since February 2013," and that "[t]here is a protection order and a no contact order in place." Appellant's App. at 26. Accordingly, the court released wardship over the children and closed this case. Id. However, it is well established that the reunification of children with their parent and the trial court's closure of the CHINS proceeding does not render an appeal from the CHINS determination moot. As we have explained:

> An appeal may be heard which might otherwise be dismissed as moot where leaving the judgment undisturbed might lead to negative collateral consequences. In Re Marriage of Stariha (1987), Ind. App., 509 N.E.2d 1117, 1123. The reasoning behind this exception is that "it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequence of the disability itself for an indefinite period of time." Id.; citing Sibron v. New York (1968), 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917.
>       We conclude that this appeal is not moot because of the potentially devastating consequences of a CHINS determination. Under West's AIC 31-6-8-1(b)(3) (Supp. 1989), the record of a CHINS proceeding is available to any criminal court judge or authorized staff member for use in a pre-sentence investigation. Under IC 31-6-8-1(b)(4) and (5), the record of a CHINS proceeding is available to the prosecutor, the Department of Public Welfare, and the Department of Correction[]. . . . The record may also be used to impeach [the parent] as a witness in any future criminal case or discredit his reputation if placed in issue. IC 31-6-8-1(g). Too, the records would be available . . . in any future action regarding custody or support . . . . IC 31-6-8-1(b)(6). Most importantly, however, we note that CHINS determinations often accumulate and in extreme cases result in the termination of parent child relationship. See Wardship of Nahrwold v. Department of Public Welfare of Allen County (1981), Ind. App., 427 N.E.2d 474, 482, trans. denied, (Staton, J. dissenting). For these reasons, we review the merits of this appeal.

Roark v. Roark, 551 N.E.2d 865, 867-68 (Ind. Ct. App. 1990); see also Ind. Code §§ 31-39-2-1 to -15 (the current version of former I.C. § 31-6-8-1).

court. Id. It is well-established that "errors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." Sibbing v. Cave, 922 N.E.2d 594, 598 (Ind. 2010) (quotations omitted). To determine whether the admission of evidence affected a party's substantial rights, we assess the probable impact of the evidence upon the finder of fact. Id. "Likewise, reversible error cannot be predicated upon the erroneous admission of evidence that is merely cumulative of other evidence that has already been properly admitted." Id.

As an initial matter, Mother asserts on appeal that the trial court abused its discretion when it admitted the Assessment into evidence. In particular, Mother argues that the admission of the Assessment violated her privilege to protect confidential communications between her and her counselor. See Ind. Code § 25-23.6-6-1. But the "[f]ailure to object to the admission of evidence at trial normally results in waiver and precludes appellate review . . . ." Konopasek v. State, 946 N.E.2d 23, 27 (Ind. 2011) (quotation omitted). Further, a party "may not argue one ground for an objection to the admission of evidence at trial and then raise new grounds on appeal. This ensures that a trial judge is fully alerted to the legal issue being raised." Id. (citation omitted).

Mother has not preserved this issue for appellate review. During the fact-finding hearing, Mother objected to the admission of the Assessment only on the grounds that the Assessment was based on hearsay and was cumulative of Mandaza's testimony. Transcript at 33-34. At no point either during Mandaza's testimony or when the DCS sought to have the Assessment admitted did Mother object on the ground that the proffered evidence was in violation of her privilege to protect confidential information.

9

See id. at 28-36.  As such, Mother has not preserved this issue for our review, and it is waived.  See Konopasek, 946 N.E.2d at 27.

Mother also argues that the trial court abused its discretion when it permitted Martin to testify by telephone without following the procedure outlined in Indiana Administrative Rule 14.[4]  In particular, Mother states that this evidence "prejudiced [her] because Martin provided evidence of the only positive drug screen admitted . . . ." Appellant's Br. at 25.  But any error in the admission of Martin's testimony was harmless.  Mother testified that she had failed a drug screen while involved with the DCS.  Transcript at 18.  And the Assessment states that Mother failed her February 2013 drug screen after she tested positive for alcohol and marijuana.  Martin's testimony that Mother failed her February 5, 2013, drug screen after testing positive for alcohol and marijuana was merely cumulative of the evidence already before the court.  Insofar as Martin additionally testified about the procedures he used to secure and analyze that drug test, Mother does not argue on appeal that that additional information affected her substantial rights.  See Ind. Appellate Rule 46(A)(8)(a).  Accordingly, any error in the trial court's admission of Martin's testimony was harmless, and we affirm the trial court's admission of the evidence into the record.  See Sibbing, 922 N.E.2d at 598.

**Issue Two:  Adjudication of the Children as CHINS**

Mother contends that the trial court's adjudication of the children as CHINS is clearly erroneous.  Indiana Code Section 31-34-1-1 provides that a child is a child in need

---

[4]  The DCS asserts that Mother failed to properly object to this issue as well, but the DCS is mistaken.  Mother objected both at the time DCS filed its written notice to have Martin testify by telephone and again at the commencement of the fact-finding hearing.  Appellant's App. at 65; Transcript at 2-3.

10

of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. "A CHINS adjudication focuses on the condition of the child." N.L. v. Ind. Dep't of Child Servs. (In re N.E.), 919 N.E.2d 102, 105 (Ind. 2010). "[A] CHINS adjudication does not establish culpability on the part of a particular parent." Id. "Said differently, the purpose of a CHINS adjudication is to protect children, not punish parents." Id. at 106.

The DCS has the burden of proving by a preponderance of the evidence that a child is a CHINS. I.C. § 31-34-12-3; Davis v. Marion Cnty. Dep't of Child Servs. (In re M.W.), 869 N.E.2d 1267, 1270 (Ind. Ct. App. 2007). When reviewing the sufficiency of the evidence to support a CHINS adjudication, we consider only the evidence favorable to the judgment and the reasonable inferences raised by that evidence. In re M.W., 869 N.E.2d at 1270. This court will not reweigh evidence or judge witnesses' credibility. Id. A CHINS adjudication "may not be based solely on conditions that no longer exist," but the court should "consider the [family's] situation at the time the case is heard by the court." S.S. v. Ind. Dep't of Child Servs. (In re R.S.), 987 N.E.2d 155, 159 (Ind. Ct. App. 2013).

Moreover, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). We may not set aside the findings or judgment unless they

11

are clearly erroneous.  Ind. Trial Rule 52(A); Menard, Inc. v. Dage–MTI, Inc., 726

N.E.2d 1206, 1210 (Ind. 2000).  In our review, we first consider whether the evidence

supports the factual findings.  Menard, 726 N.E.2d at 1210.  Second, we consider whether

the findings support the judgment.  Id.  "Findings are clearly erroneous only when the

record contains no facts to support them either directly or by inference."  Quillen v.

Quillen, 671 N.E.2d 98, 102 (Ind. 1996).  A judgment is clearly erroneous if it relies on

an incorrect legal standard.  Menard, 726 N.E.2d at 1210.  We give due regard to the trial

court's ability to assess the credibility of witnesses.  T.R. 52(A).  While we defer

substantially to findings of fact, we do not do so to conclusions of law.  Menard, 726

N.E.2d at 1210.  We do not reweigh the evidence; rather we consider the evidence most

favorable to the judgment with all reasonable inferences drawn in favor of the judgment.

Yoon v. Yoon, 711 N.E.2d 1265, 1268 (Ind. 1999).

        According to Mother, the DCS failed to demonstrate that her drug use presented a

substantial risk of harm to the children:

> [Mother] admitted to one[-]time cocaine use in November 2012[] and to the
> daily use of marijuana. . . .  The record is devoid of any evidence that
> [Mother] ever used drugs in the presence of her children or in close
> proximity to the time when she provided care for her children.  The record
> is also devoid of any evidence that [Mother] was unable to provide
> appropriate care for her children when or if she used drugs and then later
> provided care for them.  The [DCS] provided no evidence as to any
> lingering [e]ffects drug usage did have or could have on [Mother's] ability
> to parent her two children.  There was no evidence that the children were
> exposed to an environment of illegal drug use.

Appellant's Br. at 15.

        In light of the DCS's failure to connect her drug use to her children, Mother

asserts that the trial court's order is contrary to this court's opinion in Perrine v. Marion

County Office of Child Services, 866 N.E.2d 269 (Ind. Ct. App. 2007). In Perrine, the mother was arrested as part of a routine probation sweep, which located paraphernalia commonly used for methamphetamine consumption in the bedroom of a houseguest. The mother admitted to using methamphetamine a few days prior to the probation sweep. As a result of her arrest, the DCS filed a petition alleging her fourteen-year-old daughter was a CHINS based on the mother's failure to provide her child with a safe and stable home, free from drug use and neglect. The trial court found the child to be a CHINS. In reviewing the evidence, we noted that the evidence did not support a finding that the mother used methamphetamine in front of her daughter. Id. at 276. We reversed the trial court's determination on appeal, finding that a "single admitted use of methamphetamine, outside the presence of the child and without more, is insufficient to support a CHINS determination." Id. at 277; see also Bean v. State, 818 N.E.2d 148, 152 n.3 (Ind. Ct. App. 2004) ("it is not the possession of illegal drugs in the presence of children that endangers them but rather the illegal use of drugs or dealing in illegal drugs which has been found to endanger children when done in their presence.").

The DCS asserts that Perrine is not analogous to this appeal and, instead, that we should apply In re J.L., 919 N.E.2d 561 (Ind. Ct. App. 2009). In In re J.L., we distinguished Perrine and affirmed the trial court's adjudication that the child was a CHINS based on the following evidence:

> Whereas the Perrine court focused on a single admitted use, here, Mother conceded to a lengthy history of drug abuse: Mother admitted to using marijuana since she was fifteen years old and to smoking marijuana two to three times a week prior to the instant CHINS petition. Even the filing of the CHINS petition was insufficient to deter Mother's drug use as she continued using up to the date of her drug screens. And unlike Perrine,

there is clear evidence that J.L. was in the residence while Mother and [grandmother] were using illegal substances in the bathroom. The fact that J.L. was asleep in another room does not alter the finding that the child was in Mother's care and custody. While under the influence of marijuana at the time J.L. was in the residence, Mother essentially abandoned J.L. without any responsible supervision. A parent's duties do not end merely because a child is asleep. As such, we agree with the DCS that it is unreasonable to simply assert that because the child is no longer awake Mother is released from any other measures to ensure her daughter's care and safety.

In the situation before us, we find that Mother knowingly exposed J.L. to an environment of illegal drug use, which resulted in endangering J.L.'s physical or mental condition as the thirteen-month-old child was left without any responsible adult care and supervision. See I.C. § 31-34-1-1. Therefore, we affirm the trial court's determination that J.L. is a CHINS.

919 N.E.2d at 564.

Neither Perrine nor In re J.L. is on all fours with Mother's case. Here, like Perrine but unlike In re J.L., there is no evidence that the children were "in Mother's care and custody" while she used illegal substances or was under the influence of those substances. Id. But, unlike Perrine and like In re J.L., the evidence does demonstrate that Mother was an extensive drug user. She smoked marijuana daily and used cocaine once or twice per week, at least until the DCS's involvement. She stated that she had used drugs at work for "energy" and that she had used drugs outside of work "at parties, with friends and also by herself." Ex. Vol. at 14. And following the DCS's involvement, Mother failed a drug test and pleaded guilty to possession of marijuana, which was based on an arrest that occurred shortly before the DCS's involvement. We also note that the child in Perrine was fourteen years old when her mother was arrested, and the child in In re J.L. was thirteen months old. This also makes In re J.L. more analogous to Mother's

14

case, as here the children were each under three years old between the DCS's initial involvement and the trial court's order declaring them to be CHINS.

Although there is no evidence to suggest that Mother used drugs in the presence of her children, we do not find that fact dispositive here. Mandaza concluded that Mother's extensive drug use "could affect her ability to parent and her children's well-being and safety in the home." Transcript at 31. Mandaza observed that Mother's drug use "resulted in legal problems and that [it was] daily use. And [Mother] would care for her kids daily as well." Id. at 31-32.

Further, Mother's drug use was not the exclusive basis for the CHINS petition. Mother also hid the children from the DCS during the investigation and was not truthful with her case managers. She has violent relationships with the children's fathers, which FCM Washington described as a "pattern of inappropriate . . . [and] unsafe relationships in[] the children's li[ves]" that "expos[ed] those children to violence." Id. at 61. These relationships were still a concern after the DCS had become involved: Mother told FCM Thomas that she intended to move to Florida to avoid her children's fathers, and FCM Washington testified that "we need to address the problem." Id. And the trial court found Mother's inability to recall specifics about one of the violent episodes "incredib[e]." Appellant's App. at 101. In light of the evidence before the trial court, Mother's case is not analogous to Perrine's "single admitted use" of drugs "outside the presence of the child[ren] and without more." See 866 N.E.2d at 277. We cannot say that the court erred when it concluded that Mother's behavior represented "a substantial risk of endangering the children." Appellant's App. at 102.

15

Mother also argues that the evidence shows that the DCS "failed to identify a danger to the children's physical or mental condition," Appellant's Br. at 13; that she "provided the children with a home that included all working utilities, beds with bedding, food, and clothing," id. at 14; that there was "no evidence the children were mistreated, malnourished, unhealthy, [or] abused mentally, physically, or sexually," id.; that she "took the necessary steps to protect herself and her children by avoiding any contact with their two fathers," id.; and that the DCS did not "identify any services or actions they would have preferred [Mother] do," id. at 15. But each of these assertions ignores the evidence most favorable to the trial court's judgment and, instead, amounts to a request for this court to reweigh the evidence, which we will not do. See In re M.W., 869 N.E.2d at 1270.

Finally, Mother asserts that there was no evidence to show that the coercive intervention of the court was necessary. But the trial court is not required to "wait until a tragedy occurs to intervene." B.H. v. Dep't of Child Servs. (In re A.H.), 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). In her Assessment shortly before the fact-finding hearing, Mandaza recommended that Mother be subjected to "regular drug-screening for additional accountability." Ex. Vol. at 11. Mandaza also recommended that Mother participate in intensive outpatient therapy, which Mother had not completed as of the fact-finding hearing. Mother failed a drug screen and pleaded guilty to possession of marijuana during the DCS's involvement. And, again, FCM Washington testified at the hearing that Mother's plan to deal with her violent relationships with the children's fathers was "to run away from the problem" and that "we need to address the problem."

16

Transcript at 61. Mother's assertion that she had completed all recommended services before the fact-finding hearing and that her criminal history and relationships with the fathers were remote in time is contrary to the record most favorable to the judgment. Based on the evidence and our standard of review, we cannot say that the trial court's conclusion that the coercive intervention of the court was necessary is clearly erroneous.

The evidence supports the trial court's findings that, as of the fact-finding hearing, Mother continued to have extensive problems with drugs and violent relationships with the children's fathers. The evidence also supports the trial court's findings that these problems are harmful to the children. The trial court's findings support its judgment that "there is a substantial risk of endangering the children" and that the children are in need of care, treatment, or rehabilitation that they are not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court. Appellant's App. at 102. Accordingly, we affirm the trial court's adjudication that the children are CHINS.

Affirmed.

BAKER, J., and CRONE, J., concur.