## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 11 2017, 7:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffery A. Earl
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.S. (Minor Child) and A.S. (Mother);

A.S. (Mother),
*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

May 11, 2017

Court of Appeals Case No.
32A01-1611-JC-2652

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Trial Court Cause No.
32D03-1512-JC-119

**May, Judge.**

[1] A.S. ("Mother") appeals the trial court's order adjudicating J.S. ("Child") a Child in Need of Services ("CHINS"). She argues the evidence was insufficient to support the court's conclusion that the court's coercive intervention was necessary. We affirm.

## Facts and Procedural History

[2] Child was born to Mother and Jo.S. ("Father")[1] on March 4, 2009. On November 26, 2015, the Indiana Department of Child Services ("DCS") received a report alleging Child was a victim of neglect. Specifically, the report alleged Mother had taken Child to the Hendricks Regional Hospital Emergency Room ("ER") because Mother believed Child had been poisoned with opiates on her pizza. (App. Vol. II at 14-15.) Upon arriving at the hospital, Child reported "someone put drugs on her pizza." (*Id.*) Medical staff at the hospital determined Child had a urinary tract infection and pneumonia, but she tested negatively for opiates.

[3] At the time the report was filed, Mother and Father were separated and undergoing divorce proceedings. Mother and Child had moved out of the marital home in July 2015 and had been living at a shelter since then. The report also alleged Mother had recently pulled Child from her Catholic school

---

[1] Father does not participate in this appeal.

and was homeschooling Child because Mother believed the school was "poisoning their pepperonis." (Tr. at 14.)

[4] Family Case Manager ("FCM") Brown met with Mother during an unannounced visit on November 30, 2015. Mother indicated on November 26, 2015, Thanksgiving Day, "she was distracted doing a friend's nails so she [did not] know what was in the pizza." (App. Vol. II at 15.) Mother stated Child asked "eight times to go to the hospital because her chest was feeling tight and she didn't feel well." (*Id*.)

[5] On December 11, 2015, DCS received another report Mother had taken Child to the ER because Child started having a tantrum and hyperventilating, and Mother believed Child was having trouble breathing. The reporting source stated that, while at the hospital, Child was not actually having seizures, but pretended to have seizures, and Mother was "all over that." (*Id*.) That same day, FCM Brown reviewed records from Cummins Behavioral Health, which indicated Mother was diagnosed with Delusional Disorder.

[6] On December 15, 2015, FCM Brown contacted Father, who stated he was "very worried about [Child's] well-being," (*id*.)*,* and stated Mother "has a lot of influence over [Child]." (*Id*.) FCM Brown also contacted Amy Watts, a Clinical Service Specialist, who opined "[Mother's] paranoia, recent trips to the ER, her comments to the ER staff and her daughter's reactions to [Mother] cause her alarm and lead her to believe Mother is unable to care for her child in a safe and appropriate manner." (*Id*.) Watts further opined "even though

[Mother] was participating in treatment, she still does not appear to be thinking in a rational and safe manner." (*Id*.) Watts indicated Child's reactions to Mother indicate "learned behaviors of how to get Mother's attention." (Tr. at 16.) That same day, DCS removed Child from Mother's care on an emergency basis and placed Child with Father. DCS requested permission to file a CHINS petition, and the court granted DCS permission.

[7] On December 16, 2015, DCS filed a petition alleging Child was a CHINS. The court held an initial detention hearing that same day and found it was in Child's best interest to be removed from Mother's care. The court granted DCS temporary wardship of Child and authorized Child's placement with Father to continue. The court set a fact-finding hearing for February 10, 2016.

[8] At the February 10 hearing, Mother, Father, DCS, each party's counsel, and Child's GAL appeared. The parties agreed to continue the fact-finding hearing until April 6, 2016, because Mother was scheduled to undergo a psychological evaluation on February 19 and 22, 2016, and the parties agreed the report of the evaluation would be useful to the fact-finding hearing.

[9] On April 6, 2016, the court held a contested fact-finding hearing on DCS's CHINS petition. The court heard testimony from FCM Brown, FCM Ariel Irwin-Peel, and Ramona Guthrie, a caseworker at the shelter where Mother and Child had stayed. On September 26, 2016, the court entered the following Findings of Fact and Conclusions of Law:

6. Mother has a history of intermittent mental health care. Exhibit A is the psychological evaluation of Mother performed by Dr. Sarah J. Szerlong in February 2016. Mother has a long history of seizures beginning at age 15. Mother has been hospitalized 5 times for seizures.

7. Mother was previously diagnosed with personality disorder, schizotypal, paranoid, obsessive compulsive, narcissistic features, as well as rule out diagnosis of psychotic disorder due to medical condition (seizure disorder) and delusions. Mother's self-report supports a diagnosis of major depression disorder.

8. On December 10, 2015, [Child] was admitted to Hendricks Regional Health. [Child] was hyperventilating and the child stated "I'm having seizures like my mother." No seizure activity was found by medical personnel. Mother wanted [Child] tested for poisoning. Mother claims that [Child] was poisoned at Sheltering Wings and at school. Medical personnel did not find any indication that [Child] was poisoned.

9. On November 26, 2015, Mother brought [Child] to the Emergency Room at Hendricks Regional Health because Mother thought someone was poisoning [Child]. Mother accused Father of poisoning [Child]'s food multiple times.

10. Ramona Guthrie is a case manager at the protected location where Mother and [Child] lived. Ramona interacted with Mother and [Child] daily. Mother makes accusation[s] about being poisoned a lot. Mother accused Father of molesting [Child]. None of Mother's allegations were ever substantiated.

11. Father filed for divorce in Grant County and that Court has not decided custody.

21. DCS has proved by a preponderance of the evidence [that] [Child]'s mental health is seriously impaired or seriously endangered, as a result of Mother's delusions and accusations. [Child] mimics some symptoms of seizure but she did not have a seizure. [Child] at age 6 has learned how to get her Mother's attention and the attention of others by faking symptoms of seizures.

22. Mother's delusions have caused [Child] to be in fear of being poisoned according to Ms. Guthrie. Court finds Ms. Guthrie credible.

23. [Child] is only six years old.

24. Mother's supervision of [Child] is not appropriate and is unlikely to change without the coercive interaction [sic] of the court.

(App. Vol. II at 29-32.)

[10] On October 26, 2016, the court held a dispositional hearing.[2] Mother contested Child was a CHINS and maintained she was "mentally and physically capable of taking care of [Child]." (Tr. at 92.) FCM Irwin-Peel testified Mother was consistently participating in supervised visits with Child twice-weekly and was attending services at the shelter. Child was still living with Father. The court

---

[2]The court also held a dispositional hearing on October 19, 2016, at which Father appeared, but Mother did not appear.

entered a dispositional order adjudicating Child a CHINS and formally removing her from Mother's care. The court also entered a parental participation order for Mother to complete psychological and neuropsychological evaluations and follow all treatment recommendations, continue to participate in supervised visits, and follow all terms of the dispositional decree. Although the court noted Mother's sexual abuse allegations against Father were unsubstantiated and Child was permitted to remain in Father's care, the court ordered Father to undergo a domestic violence assessment per DCS's request. The court further ordered Father not to allow Mother to visit Child without DCS's supervision.

# Discussion and Decision

[11] In reviewing the sufficiency of the evidence supporting a trial court's CHINS determination, we "neither reweigh the evidence nor judge the credibility of the witnesses." *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014), *reh'g denied*. Instead, we consider only the evidence supporting the trial court's decision and any reasonable inferences drawn therefrom. *Id.* at 1287.

[12] Here, the trial court entered *sua sponte* findings of fact and conclusions of law in arriving at its determination Child was a CHINS, which is not expressly required by statute. *See id.* ("no statute expressly requires formal findings in a CHINS fact-finding order"). As to these findings, "we apply the two-tiered standard of whether the evidence supports the findings, and second whether the findings support the judgment." *Id.* However, when, as here, a party

challenges the judgment but does not challenge the findings of fact as unsupported by the evidence, we look only to the findings to determine whether they support the judgment. *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000).

[13] "Because a CHINS proceeding is a civil action, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010); Ind. Code § 31-34-12-3. Under Indiana Code Section 31-34-1-1, the State had to prove:

> (1) Child is less than eighteen years of age;
>
> (2) Child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (3) Child needs care, treatment, or rehabilitation that the child is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court.

*In re N.E.,* 919 N.E.2d at 105.

[14] We note the trial court's CHINS adjudication establishes no culpability on the part of Mother. *See In re N.E.,* 919 N.E.2d at 105 ("Only when the State moves to terminate a particular parent's rights does an allegation of fault attach."). "[A] CHINS adjudication is simply that – a determination that a child is in

need of services." *Id.* A CHINS intervention in no way challenges the general competency of a parent to continue a relationship with her child. *Id.*

[15] Here, Mother concedes DCS proved the first two elements under Indiana Code Section 31-34-1-1. Mother solely argues the evidence was insufficient to support the trial court's conclusion Child would unlikely be provided the needed care, treatment, or rehabilitation without coercive intervention of the court.

[16] In this case, the basis of DCS's CHINS petition was its concern Mother's mental health was endangering Child. As the trial court found, Mother has previously been diagnosed with Personality Disorder, Schizotypal Disorder, paranoia, and Delusional Disorder. Additionally, the trial court noted its review of Dr. Szerlong's psychological evaluation of Mother from February 2016, which reported Mother has had seizures since the age of fifteen.

[17] The court's findings reflect its recognition that Mother's delusions were seriously impairing Child's mental condition and Mother's supervision of Child was unsafe and inappropriate. Following this finding, the court noted when Mother took Child to the ER on December 10, 2015, Child stated she was "having seizures like [her] mother," (App. Vol. II at 29), and that at the young age of six, Child has learned how to get Mother's attention and the attention of others by faking symptoms of seizures. The trial court noted Mother's delusions have, according to Guthrie, caused Child to be in fear of being poisoned. The trial court noted Guthrie is the case manager at the shelter

where Mother and Child stayed, and Guthrie interacted with Mother and Child daily from July 2015, when they began staying at the shelter, until December 15, 2015, when the court removed Child from Mother. The court explicitly found Guthrie credible.

[18] Mother claims the coercive intervention of the court is not necessary because, at the time the court entered its dispositional order removing Child from her care, Mother was seeking mental health treatment at Cummins and attending other counseling services offered by the shelter. We acknowledge and commend Mother for taking the initiative to improve her mental health and to begin addressing the concerns that led DCS to file a CHINS petition in this case. However, Mother's participation in services alone is not sufficient to find the trial court's conclusion was erroneous, because the trial court's findings support its conclusion that Mother's supervision of Child is still inappropriate without the court's intervention. We cannot say the court erred. *See In re Des.B.,* 2 N.E.3d 828, 838-39 (Ind. Ct. App. 2014) (affirming trial court's CHINS determination where facts most favorable to judgment supported court's conclusion).

# Conclusion

[19] The court's unchallenged findings support its conclusion Child is a CHINS. Accordingly, we affirm the trial court's CHINS adjudication.

[20] Affirmed.

Brown, J., and Pyle, J., concur.