

I N  T H E

# Court of Appeals of Indiana

In the Matter of W.H. (Minor Child),

*Child in Need of Services*

and

V.M. (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

FILED

Mar 07 2025, 9:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



March 7, 2025

Court of Appeals Case No.
24A-JC-2241

Appeal from the Madison Circuit Court

The Honorable Stephen Koester, Judge

Trial Court Cause No.
48C02-2405-JC-202

**Opinion by Judge May**
Judges Weissmann and Scheele concur.

**May, Judge.**

[1]     V.M. ("Mother") appeals the trial court's order adjudicating her child, W.H. ("Child"), a Child in Need of Services ("CHINS") and its dispositional order directing her to complete services related to the reasons for the CHINS adjudication. Mother raises two issues for our review, which we revise and restate as:

> 1. Whether, in the order adjudicating Child a CHINS, the trial court's findings support its conclusion that Child's physical or mental health was seriously endangered or seriously impaired by Mother's inability or unwillingness to address her mental health problems such that the coercive intervention of the trial court was needed; and
>
> 2. Whether, in the trial court's dispositional order,
>
>> 2.1 the trial court properly relied upon the predispositional report despite the fact that it had not been admitted as evidence; and
>>
>> 2.2 the trial court made the required findings.

We affirm.

## Facts and Procedural History

[2] Child was born to Mother and B.H. ("Father")[1] on March 7, 2024. When Child was born, Mother experienced postpartum depression and bleeding complications, so Child was released from the hospital to his paternal grandparents because Mother "needed to kind of recover from [the bleeding and postpartum depression]." (Tr. Vol. II at 30.) Shortly after Mother's release from the hospital, Child began spending daytime hours with Mother, while paternal grandparents continued to provide overnight care.

[3] On April 28, 2024, Mother called police alleging Father raped her and told her that "he would easily be able to kill [Child]." (App. Vol. II at 23.) Following that incident, Mother began to have suicidal ideation. On April 30, 2024, Father found Mother "sitting on the couch [of their shared apartment] with several knives . . . hysterically crying and stating she was scared and wanted to hurt herself . . . [because Father] wanted to discontinue their relationship." (*Id.* at 24.) Father asked Mother to go to the hospital for psychiatric treatment, and Mother checked herself into a mental hospital. Father was unable to care for Child, so paternal grandparents cared for him while Mother was in the hospital. Mother left the hospital after "a few days[.]" (*Id.*) Paternal grandparents continued full-time care of Child, and Mother spent time with Child periodically.

---

[1] B.H. ("Father") admitted Child was a CHINS and does not participate in this appeal.

On April 30, 2024, the Department of Child Services ("DCS") received a report that Mother and Father were neglecting Child because "[Mother] contacted Local Law Enforcement and made a report that she was raped by [Father] on April 28, 2024. It was further alleged that [Father] has made comments that he would easily be able to kill [Child]." (*Id*. at 13-14.) On the same day DCS received its report, Mother had a mental health crisis that resulted in her hospitalization. On May 3, 2024, DCS filed a petition alleging Child was a CHINS based on Mother's mental health issues, Father's inability to care for Child, and the family's pending eviction. The same day, the trial court issued an order granting DCS's request to remove Child from Mother and Father's care and place him with paternal grandparents, where he was already living at the time.

On May 6, 2024, the trial court held an initial hearing on the CHINS petition. At that hearing, Mother asked that Child remain in paternal grandparents' care because she "had some postpartum depression and [she] was in a car accident[.]" (Tr. Vol. II at 16.) Mother also noted that she and Father were both "medicated to sleep" and acknowledged Child was probably safer with paternal grandparents. (*Id*.) However, she did not admit Child was a CHINS.

On July 1, 2024, the trial court held a fact-finding hearing on the CHINS petition. At that hearing, Mother testified she had "fetal alcohol syndrome[,] . . . depression and anxiety[.]" (*Id*. at 38.) DCS presented evidence that, while Mother testified at the hearing that she had been taking her psychiatric medication, she told paternal grandmother via text message on June 10, 2024,

that Mother was "going through withdrawal from [her] meds." (Ex. Vol. I at 5.)  In addition, on May 25, 2024, Mother had sent paternal grandmother a text that said, "I love [Child] but I'm half tempted to let you guys keep him [b]ecause [I don't know] how I can be there for him[.]" (*Id.* at 3.)  The trial court adjudicated Child a CHINS based on Mother's mental health struggles and failure to provide adequate care and supervision for Child.

[7]     On August 14, 2024, the trial court held a dispositional hearing.  The parties presented argument about the appropriate services to address the reasons for Child's removal from Mother's care based in part on the recommendations in the predispositional report.  On August 20, 2024, the trial court issued its dispositional order requiring Mother to, among other things: complete a parenting assessment and  all recommendations; attend supervised visitation with Child; and take steps to meet her mental health needs, including "following all directions of nurses/doctors, attending all appointments, and taking medications in the appropriate doses and frequencies specified in the prescriptions[;]" participating in individual counseling; and demonstrating "positive changes . . . as a result of the counseling." (App. Vol. II at 8-9.)

## Discussion and Decision

### 1.  CHINS Adjudication

[8]     Mother argues the trial court's findings do not support its conclusion that Child's physical or mental health was seriously endangered or seriously impaired by Mother's inability or unwillingness to address her mental health

problems such that the coercive intervention of the trial court was needed. Because a CHINS proceeding is a civil action, DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *Matter of N.E.*, 228 N.E.3d 457, 475 (Ind. Ct. App. 2024). DCS alleged Child was a CHINS pursuant to Indiana Code section 31-34-1-1, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> > (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
> >
> > > (A) when the parent, guardian, or custodian is financially able to do so; or
> > >
> > > (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
> >
> > (2) the child needs care, treatment, or rehabilitation that:
> >
> > > (A) the child is not receiving; and
> > >
> > > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

A CHINS adjudication focuses on the needs and condition of the child. *N.E.*, 228 N.E.3d at 476. The purpose of a CHINS adjudication is not to punish the parent but to provide proper services for the benefit of the child. *Id*. at 475. "[T]he acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id*. at 476.

> While we acknowledge a certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that - a determination that a child is in need of services. Standing alone, a CHINS adjudication does not establish culpability on the part of a particular parent. Only when the State moves to terminate a particular parent's rights does an allegation of fault attach. We have previously made it clear that CHINS proceedings are "distinct from" involuntary termination proceedings. The termination of the parent-child relationship is not merely a continuing stage of the CHINS proceeding. In fact, a CHINS intervention in no way challenges the general competency of a parent to continue a relationship with the child.

*Matter of To.R.*, 177 N.E.3d 478, 485 (Ind. Ct. App. 2021) (quoting *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)), *trans. denied*.

[9] When a trial court enters findings of fact and conclusions of law in a CHINS decision, we apply a two-tiered standard of review. *In re Des. B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014). We consider first whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We may not set aside the findings or judgment unless they are clearly erroneous. *Id*. Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it

relies on an incorrect legal standard. *Id.* We give due regard to the trial court's ability to assess witness credibility and do not reweigh the evidence; we instead consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* We defer substantially to findings of fact but not to conclusions of law. *Id.* "We accept unchallenged findings as true." *Henderson v. Henderson*, 139 N.E.3d 227, 232 (Ind. Ct. App. 2019).

[10] Mother argues the trial court's findings do not support its conclusion that Child's physical or mental health was seriously endangered or seriously impaired by Mother's inability or unwillingness to address her mental health issues such that the coercive intervention of the trial court was needed. Mother does not challenge any of the trial court's findings, and thus we accept them as true. *See Henderson*, 139 N.E.3d at 232 (unchallenged findings accepted as true).

[11] In its order adjudicating Child a CHINS, the trial court found:

> 6. The case was initiated following [Mother] having a mental health crisis and paternal grandmother [] taking her to a facility for an acute stay to address suicidal ideations.

> 7. At the time of the initiation, [Child] already resided with paternal grandparents due to neither parent being able to care for [Child] safely upon his discharge from the hospital after birth.

> \* \* \* \* \*

10.  [Child] was born on March 7, 2024.  Following [Child's] birth, [Mother] was experiencing postpartum depression and discussed the options of safe haven and adoption for [Child].

11.  [Mother] did not take her prescribed mental health medications during her pregnancy.

12.  At that time, the family and medical team ultimately decided [Child] would go home with paternal grandparents [].

13.  [Mother's] team believed that with her state of mind upon her discharged [sic] from the hospital, she [was] unable to care for [Child] safely.

14.  Since release from the hospital, [Child] has never stayed overnight in the care of either of his parents.

15.  At the fact finding on July 1, 2024, [paternal grandmother] testified that based on her observations she did not think [Child] was safe in the care of [Father] or [Mother].

* * * * *

17.  From the time [of] [Child's] release from the hospital until [DCS's] involvement, [Mother] would intermittently care for [Child] during the day.  [Child] would return to [paternal grandparents'] care in the evening.

18.  [Mother] and [Father] both take sleeping medication that renders them unlikely to be responsive if [Child] were to awaken in the night.

19. During this time, [Mother] was not properly managing her mental health medications.

20. [Mother], by her own admission, was on several occasions unable to care for [Child] due to her own mental health concerns. . . .

* * * * *

22. It was alleged that [Mother] contacted Local Law Enforcement and made a report that she was raped by [Father] on April 28, 2024. It was further alleged that [Father] has made comments that he would easily be able to kill [Child].

* * * * *

24. On or about April 30, 2024, [Father] and [Mother] were living in an apartment together. [Father] returned to the apartment to find [Mother] sitting on the couch with several knives. [Father] had previously attempted to hide the knives from [Mother] and was unsure where she obtained the knives.

25. [Mother] was hysterically crying and stating she was scared and wanted to hurt herself. She was verbally upset that [Father] wanted to discontinue their romantic relationship.

26. In response to this incident, [paternal grandmother] and [Father] asked [Mother] to go to the hospital for treatment. [Mother] ultimately agreed.

27. [Mother] was checked in to a mental hospital in Plainfield. [Father] at the time stated that [Child] should remain in the care of paternal grandparents and he was unwilling to care for [Child].

28. [Mother] left treatment after only staying for a few days.

29. Since the opening of the CHIN[S] case, [Mother] still is not properly managing her medication. As seen in DCS exhibit 1, on June 10, 2024, [Mother] stated she was going through withdraws [sic] from her "meds".

\* \* \* \* \*

31. [Mother] has struggled to maintain employment. At the time of the initial hearing on May 6, 2024, [Mother] stated she was unemployed but seeking to return to her former employment.

32. [Mother] does not have a drivers license, a vehicle or a reliable form of transportation. Prior to the CHIN[s] case, [Mother] often relied on paternal grandparents for support and transportation however at the fact finding on July 1, 2024, paternal grandmother stated they would no longer assist [Mother] with transportation.

33. [Mother] has struggled to maintain a position on whether she wants [Child] returned to her care.

34. As seen in DCS exhibit 1, [o]n May 25, 2024, [Mother] sent a text message stating she did not know how she would be a mom to [Child] if she had no help.

35. As seen in DCS exhibit 1, [o]n May 25, 2024, [Mother] sent a text message stating she was "half tempted to let [paternal grandparents] keep [Child]."

36. As seen in DCS exhibit 1, [o]n May 20, 2024, [Mother] sent another texting [sic] offering to let [paternal grandparents] keep [Child] because she didn't see "things getting better."

(App. Vol. II at 22-5.)  Based thereon, the trial court concluded:

6. . . . [Child's] physical condition is seriously endangered as a result of [Mother's] and [Father's] inability, refusal, or neglect to provide [Child] with adequate care and supervision by a safe and stable caregiver when [Mother] and [Father] are financially able to do so and/or as a result of [Mother's] and [Father's] failure and refusal to seek reasonable means to do so.

* * * * *

8.[Father] and [Mother] neglected [Child] by failing to seek out the appropriate mental health care and medication management. Said neglect resulted in the removal of [Child] from their care.

9.  [Child] is a Child in Need of Services that he is currently not receiving and is unlikely to receive without the coercive intervention of the Court.

10.  [Father] is indifferent regarding the care and placement of [Child].  Fact-Finding Hearing show[s] that the coercive intervention of the Court is the only means by which [Father] and [Mother] will participate in the aforementioned services necessary to ensure [Child's] safety and [Child's] supervision by a capable and safe caregiver.

(*Id*. at 27.)

[12] Mother argues "the fact that [Mother] had postpartum depression does not make her unfit to care for her son." (Mother's Br. at 15.) However, the trial court did not indicate Child was a CHINS because of Mother's postpartum depression. Nor did the trial court find Mother was "unfit." As our appellate courts have reiterated repeatedly, a CHINS adjudication focuses on the needs and condition of the child, not on the culpability of the parents. *N.E.*, 228 N.E.3d at 476. The trial court was concerned with the impact of Mother's mental health on Mother's ability to care for Child without assistance. Further, Mother does not challenge the findings regarding the incident in which Father found her surrounded by knives while indicating she wanted to harm herself or the finding that Mother refused to care for Child when she is struggling with her mental health. She also argues that the trial court's intervention was not required because she and Child did not need services. However, the trial court made several findings about how Mother did not consistently take her medication and did not know how to care for Child. Therefore, we hold that the trial court's findings support its conclusion that Child's physical or mental health was seriously endangered or seriously impaired by Mother's inability or unwillingness to address her mental health problems such that the coercive intervention of the trial court was needed. *See, e.g.*, *id.* at 476-7 (child seriously endangered and needs unmet based on parents' domestic violence and refusal to participate in domestic violence services).

## 2. Dispositional Order

[13] Mother presents two arguments regarding the trial court's dispositional order – (1) the trial court improperly referenced the predispositional report because it had not been entered into evidence, and (2) the court did not make certain findings in the order. Pursuant to Indiana Code section 31-34-19-1:

> (a) The juvenile court shall complete a dispositional hearing not more than thirty (30) days after the date the court finds that a child is a child in need of services to consider the following:
>
>> (1) Alternatives for the care, treatment, rehabilitation, or placement of the child.
>>
>> (2) The necessity, nature, and extent of the participation by a parent, a guardian, or a custodian in the program of care, treatment, or rehabilitation for the child.
>>
>> (3) The financial responsibility of the parent or guardian of the estate for services provided for the parent or guardian or the child.

> In its dispositional order, the trial court must make findings concerning:
>
>> (1) The needs of the child for care, treatment, rehabilitation, or placement.
>>
>> (2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.
>>
>> (3) Efforts made, if the child is a child in need of services, to:

(A) prevent the child's removal from; or

(B) reunite the child with;

the child's parent, guardian, or custodian in accordance with federal law.

(4) Family services that were offered and provided to:

(A) a child in need of services; or

(B) the child's parent, guardian, or custodian;

in accordance with federal law.

(5) The court's reasons for the disposition.

Ind. Code § 31-34-19-10(a)(1-5). In making the required findings, the trial court "may incorporate a finding or conclusion from a predispositional report as a written finding or conclusion upon the record[.]" Ind. Code § 31-34-19-10(b).

## 2.1 Predispositional Report

[14] Mother argues the trial court erred when, in its dispositional order, it referenced the predispositional report as a source of information in making its decision because the predispositional report was not entered into evidence. However, Mother has cited no statute or case law that requires the predispositional report to be entered into evidence to be considered by the juvenile court during the dispositional hearing.

[15] Instead, juvenile courts are required by statute to order preparation of a predispositional report. Ind. Code § 31-34-18-1(a). Parents, guardians, and even the child at issue have the ability to submit alternate reports for the court to consider. Ind. Code § 31-34-18-1(b). Preparation of the report is to include "individuals who have expertise in professional areas related to the child's needs[,]" Ind. Code § 31-34-18-1.1, and result in a list "of resources and programs available" to assist the child, Ind. Code § 31-34-18-1.3, and the parents, if necessary. Ind. Code § 31-34-18-2. The report is also to include a recommendation about the child's placement. Ind. Code § 31-34-18-4. After a predispositional report is prepared, it must be submitted to the juvenile court, which must then provide a copy to all attorneys of record at least forty-eight hours before the dispositional hearing. Ind. Code § 31-34-18-6. As noted above, the trial court may, in its dispositional order, "incorporate a finding or conclusion from a predispositional report as a written finding or conclusion upon the record[.]" Ind. Code § 31-34-19-10(b).

[16] In light of the statutory obligation for a juvenile court to order the preparation of a predispositional report that is intended to assist the court in entering the dispositional order, we see predispositional reports being akin to presentence investigation reports, which must be created before a defendant convicted of a felony may be sentenced. Ind. Code § 35-38-1-8. Presentence investigation reports are to contain various forms of information intended to assist the court in creating the appropriate sentence for a specific defendant and crime, *see* Ind. Code § 35-38-1-9, and defendants have the right to submit their own report for

the court to consider. Ind Code § 35-38-1-11. As with pre-disposition reports, presentence reports must be provided to the parties prior to the sentencing. Ind Code § 35-38-1-12.

[17] Importantly, our Indiana Supreme Court has referred to presentence investigation reports as "'non-evidentiary' information" that a trial court "can properly consider" when deciding how to sentence a defendant. *Schiro v. State*, 479 N.E.2d 556, 559 (Ind. 1985), *cert. denied*, 475 U.S. 1036 (1986). We see no reason not to apply that same logic to the predispositional report. Because the court was required to order preparation of the report and the report had to be provided to the parties prior to the dispositional hearing, the report did not need to be admitted into evidence to be part of the record that the juvenile court could consider. Mother has not demonstrated the juvenile court erred by considering the predispositional report.

## 2.2 Findings

[18] Mother argues the dispositional order "does not contain findings of fact[.] It merely sets out what [Mother and Father] were to do. It does not say the intervention of the state or the ordered services were necessary." (Mother's Br. at 10) (citation to the record omitted). We address each separately.

[19] Contrary to Mother's first assertion, the order includes findings:

> [Child] having been found to be a [CHINS,] the Court, after
> reviewing the Predispositional Report(s) and hearing statements
> and evidence presented to the Court regarding the disposition of
> this cause, ___*finds*___:

> The needs of [Child] for care, treatment, or rehabilitation are: for [Child's] parents or caregivers to participate and successfully complete a program of services and oversight to remedy [Child's] CHINS conditions and fulfill parental responsibilities to [Child].
>
> Participation by the parent, guardian, or custodian in the plan for [Child] is _**necessary**_ to: ensure [Child] safety and to reunify the family.

(App. Vol. II at 7) (emphases added).

[20] Mother's second assertion is that the trial court erred by not including a finding that "intervention of the state or the ordered services were necessary." (Mother's Br. at 10). Indiana Code section 31-34-19-10 requires the trial court to make findings and conclusions regarding the child's needs for care, the need for parental participation in that care, any efforts or services already provided to parents, and the reason for the trial court's dispositional order. That list does not include a finding that state intervention was necessary – instead that conclusion is required when a Child is adjudicated a CHINS pursuant to 31-34-1-1(2)(B), and the trial court here made that conclusion as part of its CHINS order. (_See_ App. Vol. II at 27) (Child in need of services "unlikely to receive without coercive intervention of the Court" and "coercive intervention of Court is only means by which" parents will participate). As for a finding that the ordered services were necessary, the court's findings quoted in our prior paragraph indicate that services are necessary to protect Child and reunify the family. Accordingly, Mother has not demonstrated error. _See_, _e.g._, _M.G._ v.

*S.K.*, 162 N.E.3d 544, 549 (Ind. Ct. App. 2020) (no error when trial court not required by statute to make a finding).

## Conclusion

[21] The juvenile court's findings supported its adjudication of Child as a CHINS. Further, the predispositional report did not need to be admitted into evidence at the hearing to be considered by the juvenile court. Finally, Mother has not demonstrated error in the dispositional order. Accordingly, we affirm.

[22] Affirmed.

Weissmann, J., and Scheele, J., concur.

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

John R. Oosterhoff
Deputy Attorney General
Indianapolis, Indiana