

FILED

Dec 04 2025, 9:00 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court


IN THE

# Court of Appeals of Indiana

In the Matter of: T.F. and M.F. (Minor Children),

*Children in Need of Services*

and

D.F. (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 4, 2025

Court of Appeals Case No.
25A-JC-1450

Appeal from the Shelby Superior Court

The Honorable R. Kent Apsley, Judge

Trial Court Cause Nos.
73D01-2502-JC-10
73D01-2502-JC-11

**Opinion by Judge May**

Chief Judge Altice and Judge Foley concur.

**May, Judge.**

[1] D.F. ("Mother") appeals the adjudication of her children, T.F. and M.F. ("Children"), as Children in Need of Services ("CHINS") and the dispositional decree continuing their removal from her care. Mother contends that her "limited admission" did not establish all statutory elements required for a CHINS adjudication and that the trial court abused its discretion by not returning Children to her care in the dispositional order. We affirm.

## Facts and Procedural History

[2] Mother[1] is the mother[2] of T.F., born July 2014, and M.F., born April 2018. In January 2025, the Department of Child Services ("DCS") received reports alleging that T.F. had been a victim of sexual abuse by her grandfather[3] ("Maternal Grandfather") and that Children were victims of neglect and physical abuse perpetrated by Mother. In addition, the reports indicated T.F. engaged in self-harming behavior, expressed suicidal ideation, and had violent

---

[1] Children's father is deceased.

[2] Mother also is the mother of S.M., who is not part of this proceeding.

[3] DCS ultimately determined this allegation was unsubstantiated.

outbursts toward Mother.  On one occasion, T.F.'s behavior frightened M.F. enough that M.F. called Maternal Grandfather, who then called police.

[3]     In January 2025, Family Case Manager Kimberly Ernest ("FCM Ernest") visited Mother's home and observed "a lot of clutter on the stairways . . . [a] sink full of dirty dishes . . . empty beer cans all over . . . [and] multiple garbage bags in the hallway[.]"  (Tr. Vol. II at 7.)  FCM Ernest also observed "a rope hanging up" and M.F. "put it around her neck" to demonstrate how T.F. used the rope.  (*Id.*)  The next day, FCM Ernest returned to the house and Mother reported T.F. had hurt animals and had written a letter indicating she intended to "chop up a boy . . . with a hatchet and watch him bleed to death."  (*Id.* at 8.)  Mother confirmed she was aware of allegations that Maternal Grandfather may have sexually abused T.F.  FCM Ernest noted T.F. was "getting more actively violent" and there was "really no discipline" in the home.  (*Id.* at 9.)  During a visit in late January 2025, FCM Ernest met with Mother, who was visibly intoxicated.

[4]     On February 18, 2025, FCM Ernest spoke with T.F., who had a "purple yellowish bruise about 2 inches in size on her right cheek."  (App. Vol. II at 14.)  T.F. told FCM Ernest the bruise appeared after Mother slapped her in the face the previous evening.  T.F. also told FCM Ernest that Mother drank alcohol every day.  On the same day, FCM Ernest spoke with M.F., who reported she had not eaten lunch or dinner the previous day when her school had an e-learning day.  M.F. told FCM Ernest that she did not sleep well because T.F. and Mother "fight or yell."  (*Id.*)  That day, DCS removed Children from

Mother's care due to the conditions in the home, T.F.'s facial bruise, and Mother's intoxication. DCS placed Children with maternal grandparents.[4]

On February 20, 2025, DCS filed petitions alleging Children were CHINS, as defined in Indiana Code section 31-34-1-1 and/or section 31-34-1-2, based on Mother's serious alcohol abuse, the poor and dangerous condition of the home, and T.F.'s serious mental health issues. On April 21, 2025, the trial court held the factfinding hearing. At the beginning of the hearing, Mother's counsel indicated Mother wished to "enter a limited admission[.]" (Tr. Vol. II at 30.) The trial court asked DCS if it was in agreement with this suggestion, and counsel for DCS explained:

> [I]n the petition there are things where we think Mom had had some drinking problems, all, but she has herself has now completed an inpatient program. Uh, there were problems with the house that my understanding is that Grandpa and everybody helped her and that's all cleaned up. So there are problems that within some CHINS cases you could get to this stage and actually argue that's it's not even a CHINS anymore; Mom's taken care of those things. However, this is a case where the, where there are other problems, and we don't have to prove the causation, what causes them, it could be completely unrelated. I don't know. But definitely that oldest child, [T.F.], has severe problems, is suicidal and has had to have two inpatient since we opened the case. Has had another one, I think over the weekend, back in Bloomington Meadows. The younger child, [M.F.], has

---

[4] The allegations of sexual abuse were unsubstantiated following a forensic interview in which T.F. reported Maternal Grandfather "placed his hand on her leg as she was getting out of the car, um, cause she said her siblings were in the back seat, um, and that was it. She was angry because he had called the police to break up an altercation between [Mother] and [T.F.]." (Tr. Vol. II at 9.)

lived with that uh, in the same home. They're both in therapy now and so my understanding the admission would be that uh, the children definitely need services that can not [be] provided without the coercive intervention of the Court.

(*Id.* at 30-31.)

Mother's counsel then dialogued with the trial court:

[Mother's Counsel]: So, in summary basically, because of the behaviors of [T.F.] . . . [Children] are receiving services through DCS. Those services are helpful . . . and Mother has informed me that while [T.F.] did previously have a therapist and there is hope to get her back to that therapist at this time, she is receiving DCS services and we need those services in place at this time.

[Trial Court]: All right. And Mother would not otherwise to be able to, to obtain those services for [Children] without the coercive intervention of the court?

[Mother's Counsel]: Mother would be able to provide services, the question would it be the same services and that the intensive nature of the services that [T.F.'s] receiving right now with the urgent nature of this situation.

* * * * *

[Mother's Counsel]: Yes, Judge it basically is [as] I have stated. Mother had had some plans in place. It was when everything fell apart and then DCS helped out. She needed those services. She um, I believe there will be a time in the near future where she will not need those services but as of today, those services are needed.

(*Id.* at 31-32.)

The trial court confirmed with Mother that she had been in court on the prior occasion when the petitions were reviewed. Mother responded in the affirmative when the trial court asked her if she wanted to waive the fact-finding hearing and admit that Children were CHINS. The trial court thoroughly advised Mother of her rights and again asked if Mother had decided not to move forward with a fact-finding hearing and would admit that Children were CHINS. Mother again responded in the affirmative. The trial court explained that by admitting Children were CHINS, the trial court would adjudicate them as such without a fact-finding hearing. Mother stated she understood and confirmed that she consulted with her attorney concerning her decision. The trial court accepted Mother's admission that Children were CHINS, finding she knowingly and voluntarily waived her right to a fact-finding hearing.

On May 2, 2025, the trial court entered its order on the hearing. The court memorialized that Mother entered an admission and then found:

> 1. Mother has since the filing of the CHINS petition completed an inpatient treatment program on her own and is engaging in aftercare services.
>
> 2. Mother has since the filing of the petition addressed problems concerning the condition of the home.
>
> 3. [T.F.] continues to have problems that require services to be provided by the court. [T.F.] has harmed herself and has been in need of three separate inpatient stays for mental health treatment.

> 4. [Children], due to the acting out and mental [health] needs of
> [T.F.], are in need of therapy and counseling services they would
> not receive without the coercive intervention the court.

(App. Vol. II at 37.) The trial court adjudicated Children as CHINS "pursuant to I.C. 31-34-1-1." (*Id.*) The trial court continued Children in relative placement with maternal grandparents and ordered that Mother should have "supervised visitation with the children to be supervised by a DCS provider and also by placement." (*Id.* at 38.) The trial court also ordered the preparation of a predispositional report.

[9]　On May 19, 2025, the trial court held a dispositional hearing at which Mother and Family Case Manager Sydney Hicks ("FCM Hicks") testified. By this time, T.F. had spent additional time in an inpatient mental health facility and had been placed with a foster family because T.F. thought maternal grandparents "did not understand her mental health needs and that they struggle to maintain boundaries between [her] and [Mother]." (Tr. Vol. II at 44.) T.F had not needed to be hospitalized again during the most recent seventeen days in foster placement, and DCS had been providing a home-based case worker to help T.F. with schoolwork. M.F. told FCM Hicks that she wanted to go home to Mother's house, but FCM Hicks believed the trial court should order visitation supervised by a third party before allowing M.F. to return home. FCM Hicks testified Mother was "already doing weekly random drug screens, she's completing a substance use treatment through an [intensive outpatient program] and she is, it's my understanding that she's completing

therapy." (*Id.*) FCM Hicks indicated DCS wanted Mother to also "complete a parenting assessment and follow any recommendations of that assessment and . . . participate in home-based case work [to] help her with building her parenting knowledge, um, and maintaining [a] stable home." (*Id.*) Mother testified she did not have any problem with the additional services that DCS wanted her to complete, but she wanted M.F. and T.F. to be back home because she believed T.F. was "feeling left out" when T.F. was in foster care but the other children spend time with Mother every day. (*Id.* at 47.) Mother also had concerns about the fact that T.F.'s medications had been altered by the doctors during her last inpatient stay, but DCS had not acquired those new medications for T.F. in the nearly three weeks that had passed since she was released. FCM Hicks reported the medication issue was a miscommunication between DCS and Bloomington Meadows, and the trial court admonished DCS to "get that taken care of ASAP." (*Id.* at 73.) The trial court then explained:

> All right. Um, I appreciate everybody's perspective here today. I understand that this has a lot of working pieces. We've got several kids involved with their issues. We've have Mom who also has her issues. Um . . . I'm not unmindful that everybody's past behaviors and treatments and things that they've been through, so I have to keep that in perspective. At the same point, generally my, my goal here is to try to, to reunify the family as quickly and safely as I possibly can, in this case. And sometimes time, time is our enemy. The longer we stretch things out the worse it gets. I understand again, everybody's perspective here. Let me say with regard to [M.F.], uh, I , I will accepts DCS' request or recommendation that there be a period of some supervised visitation between Mom utilizing the third-party provider. I don't want that to go beyond about 30 days and after

that 30 days then what I want to see is us do our normal transition and step down to basically a trial home visit. So, if we feel the need to have some third-party supervisor, I don't want that to go beyond the 30 days. But after that we're going to start transitioning [M.F.] back home, everything else being equal. So, maybe a little bit of delay in the way you would like to see it but my hope is to give the Court some ease about how that's going to happen. . . . With regard to [T.F.], I think generally most would concede, you know, that it's no, she's not ready to be home at this point. Her current placement, my order will be her current placement will continue under these circumstances. . . . I want to make sure that my order provides for some definite scheduled visitation with Mom, no less than twice a week for 3 weeks. . . . The rest of the . . . recommendations I will adopt here today.

(*Id*. at 72-73) (errors in original). The trial court ordered a review hearing to be scheduled for 90 days later.

[10] On June 2, 2025, the trial court entered a dispositional decree that memorialized its statement at the conclusion of the hearing. The trial court continued M.F.'s placement with maternal grandparents and continued T.F.'s placement in foster care. The trial court required Mother to complete the additional services as requested by DCS at the hearing. The trial court also ordered Mother to engage in supervised visitation with T.F. "no less than twice per week for three hours in duration" and with M.F. while supervised by maternal grandparents or third-party supervision. (*Id*. at 61.)

## Discussion and Decision

[11] Mother challenges the trial court's CHINS adjudication and dispositional order. "Because a CHINS proceeding is a civil action, the State must prove by a

preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). DCS alleged Children were CHINS pursuant to Indiana Code section 31-34-1-1, which states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>>
>>> (A) when the parent, guardian, or custodian is financially able to do so; or
>>>
>>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>>
>> (2) the child needs care, treatment, or rehabilitation that:
>>
>>> (A) the child is not receiving; and
>>>
>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

"A CHINS adjudication focuses on the condition of the child[.]" *Matter of N.E.*, 228 N.E.3d 457, 476 (Ind. Ct. App. 2024) (quoting *In re N.E.*, 919 N.E.2d at 106). "The purpose of a CHINS adjudication is not to punish the parent but to

provide proper services for the benefit of the child." *Matter of W.H.*, 254 N.E.3d 549, 554 (Ind. Ct. App. 2024).

[12] When a trial court enters findings and conclusions,

> [w]e may not set aside the findings or judgment unless they are clearly erroneous. In our review, we first consider whether the evidence supports the factual findings. Second, we consider whether the findings support the judgment. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it relies on an incorrect legal standard. We give due regard to the trial court's ability to assess the credibility of witnesses. While we defer substantially to findings of fact, we do not do so to conclusions of law. We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment.

*In re Des.B.*, 2 N.E.3d 828, 836 (Ind. Ct. App. 2014) (internal quotations and citations omitted). "We accept unchallenged findings as true." *Henderson v. Henderson*, 139 N.E.3d 227, 232 (Ind. Ct. App. 2019).

## 1. CHINS Adjudication

[13] Mother first argues that her "limited admission" did not establish all statutory elements required for a CHINS adjudication under Indiana Code section 31-34-1-1.[5] (Tr. Vol. II at 30.) We disagree.

---

[5] Mother also argues entry of the CHINS adjudication under Indiana Code section 31-34-1-6 would have been more appropriate and, in support, she points to our Indiana Supreme Court's decision in *Matter of E.K.*,

[14]     When DCS files a CHINS petition, courts must give parents an opportunity to admit or deny the petition's allegations. Ind. Code § 31-34-10-6. When a parent so admits, the court is to enter the judgment and schedule a hearing on appropriate disposition. Ind. Code § 31-34-10-8. A judicial admission, whether made in pleadings or at trial, is "conclusive upon the party making" it and "relieves the opposing party of the duty to present evidence on that issue." *Hayden v. Franciscan Alliance, Inc.*, 131 N.E.3d 685, 693 (Ind. Ct. App. 2019), *trans. denied*.

[15]     Here, Mother's counsel informed the trial court that Mother would enter a "limited admission." (Tr. Vol. II at 30.) The trial court confirmed with DCS that the limited admission was acceptable to DCS. The trial court then thoroughly advised Mother of her rights, confirmed that she had previously reviewed the petitions with the court, and asked whether she wanted to "waive

---

260 N.E.3d 901 (Ind. 2025). In *E.K.*, a mother refused to take a teenage son back into her home because he had "a long history of violence toward her and his siblings." *Id.* at 904. DCS petitioned for the child to be adjudicated a CHINS under Indiana Code section 31-34-1-1 because the parents failed to provide necessary shelter for the child, and the parents argued the trial court should enter the adjudication under section 31-34-1-6, because the child was a danger to himself or others, or under section 31-34-1-10, because of his fetal alcohol syndrome. The trial court entered the adjudication under section 31-34-1-1, and the parents appealed the adjudication. Our Indiana Supreme Court explained that "the critical consideration for a court in any CHINS proceeding is not deference to DCS's filing decision but advancement of the child's best interests." *Id.* at 918. The Court held that trial courts have authority to amend petitions to include different CHINS categories when doing so serves the child's best interests and does not prejudice the child's rights. *Id.* at 910. Such amendments are appropriate under Indiana Trial Rule 15(B), which permits the amendment of pleadings to conform to the evidence presented at trial. *Id.* at 914.

Herein, not only did Mother not ask the trial court to adjudicate T.F. a CHINS under Indiana Code section 31-34-1-6 – arguably thereby waiving this issue for appeal, *see Borth v. Borth*, 806 N.E.2d 866, 871 (Ind. Ct. App. 2004) ("[a] party may not advance a theory on appeal which was not originally raised at the trial court") – Mother also waived her right to a factfinding hearing, which means no evidence was presented at a trial that could justify an amendment of the pleadings under Trial Rule 15(B). Under these particular facts, we reject Mother's argument that the trial court should have entered a disposition under section 31-34-1-6.

that Fact-Finding Hearing and today, admit that your children are Children in Need of Services." (*Id.* at 34-35.) Mother answered "Yes." (*Id.*) The trial court explained that by admitting Children were CHINS, "the Court will make a finding and an order that the children are Children in Need of Services without that Fact-Finding Hearing taking place." (*Id.* at 36.) Mother confirmed she understood and had consulted with her attorney.

[16]    Mother now argues that her counsel's equivocal responses during the colloquy demonstrate that she did not admit to all statutory elements. We acknowledge that the colloquy regarding Mother's limited admission could have been clearer, particularly regarding what Mother was and was not admitting.[6] However, Mother overlooks the critical fact that she personally confirmed to the trial court – twice – that she wanted to admit that her children were CHINS. Mother's admission was knowingly and voluntarily made after full advisement of her rights. By admitting that her children were CHINS and waiving her right to a fact-finding hearing, Mother relieved DCS of its obligation to prove the elements of Indiana Code section 31-34-1-1 by a preponderance of the evidence. Having made that choice, Mother cannot now challenge the sufficiency of evidence supporting the adjudication of Children as CHINS. *See*, *e.g.*, *Hayden*,

---

[6] We take this opportunity to emphasize the importance of creating a clear and unambiguous record. When an admission is characterized as "limited," the scope and boundaries of the limitation should be clear on the record, especially regarding what specific allegations a parent is admitting.

131 N.E.3d at 693 (when plaintiff had admitted a fact in her pleading, the fact was settled and could not later be litigated).

## 2. Dispositional Decree

[17] Mother next argues that the trial court abused its discretion by continuing Children's removal from her care at disposition. At a dispositional hearing, the court is to consider options for placement and rehabilitation of children and also the necessity of services for parents. Ind. Code § 31-34-19-1(a). The dispositional decree then must include written findings and conclusions about those issues. Ind. Code § 31-34-19-10. We review the trial court's dispositional order for an abuse of discretion. *In re B.W.*, 266 N.E.3d 744, 751 (Ind. Ct. App. 2025), *trans. denied*. "An abuse of discretion occurs when the court's action is 'against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual inferences drawn therefrom.'" *Id*. (quoting *A.C. v. State*, 144 N.E.3d 810, 813 (Ind. Ct. App. 2020)).

[18] Mother contends Children should have been returned to her care because she had remedied the initial problems that led to their removal. However, Mother does not challenge any specific finding made by the trial court in its dispositional decree, and we accordingly accept those findings as correct. *See Henderson*, 139 N.E.3d at 232 ("We accept unchallenged findings as true.").

[19] The dispositional decree contains numerous findings that support the trial court's decision to continue Children's removal. The decree found that "it is in the best interests of the children to be removed from the home environment and

remaining in the home would be contrary to the welfare of the children because: of an inability, refusal or neglect to provide shelter, care, and/or supervision at the present time." (App. Vol. II at 60.) The decree also found that "reasonable efforts were made by DCS to prevent or eliminate the need for removal of the children." (*Id*.) Additionally, the decree noted that T.F. had been placed in emergency care for mental health treatment and had experienced multiple residential placements, and that she was now in foster care with therapy occurring in placement. (*Id*. at 61.)

[20] At the dispositional hearing, DCS asked Mother if she agreed to doing the services that DCS wanted her to do, and Mother responded: "Yes. I'm fine with it. I agree that they, they're a huge help. They can get [T.F.] into services quicker than I can and that's kind of what [we] agreed to last time but I didn't realize it was going to end up in foster care and situations of that matter." (Tr. Vol. II at 56.) While Mother may not have understood T.F. might end up in foster care, the evidence at the dispositional hearing indicated T.F. requested to be moved from maternal grandparents' home, in part because they failed to enforce proper boundaries between T.F. and Mother. Mother has not demonstrated that the trial court's findings were clearly erroneous or that the court abused its discretion in continuing Children's removal from her home. Accordingly, we affirm the dispositional decree.

## Conclusion

[21] Because Mother has not demonstrated the trial court abused its discretion when adjudicating Children as CHINS or entering the dispositional decree, we affirm.

[22] Affirmed.

Altice, C.J., and Foley, J., concur.

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Abigail R. Recker
Supervising Deputy Attorney General
Indianapolis, Indiana